**SUPRA MEDICAL CORP.**

v.

**James R. McGONIGLE et al.**

Civil Action No. 96–3737.

United States District Court, E.D. Pennsylvania.

Jan. 31, 1997.

Steven R. Waxman, Kleinbard, Bell & Brecker, Philadelphia, PA, Jonathan L. Rosner, Rosner, Bresler, Goodman & Bucholz, New York City, for Plaintiff.

Koji F. Fukumura, Bochetto & Lentz, P.C., Philadelphia, PA, for Defendants.

## MEMORANDUM

RAYMOND J. BRODERICK, District Judge.

Plaintiff Supra Medical Corp. instituted this action on May 16, 1996 against eight defendants pursuant to the Racketeer Influ-

enced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 et seq., alleging that the defendants had engaged in a scheme to defraud the Plaintiff by misappropriating the Plaintiff's proprietary interest in its medical scanner equipment and technology.

Presently before the Court are the motions of three defendants who are residents of the United Kingdom to dismiss Plaintiff's complaint pursuant to Fed.R.Civ.P. 12(b)(1), 12(b)(2), 12(b)(5), and 12(b)(6), as well as on the grounds of forum non conveniens. The moving defendants are the United Medical and Dental Schools of Guy's and St. Thomas's Hospitals (hereinafter "UMDS" or "the Schools"), Dr. Mary Dyson, and Hugh Lewis (hereinafter collectively the "UMDS Defendants").

The UMDS Defendants move to dismiss under Rule 12(b)(1) on the grounds that the Schools, and also the individuals acting in the scope of their employment with the Schools, are immune from suit as agencies or instrumentalities of the United Kingdom pursuant to the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602 et seq.; under Rule 12(b)(2) on the grounds that the Court may not exercise personal jurisdiction over them; under Rule 12(b)(5) on the grounds that Plaintiff violated the Hague Convention in effectuating service of process; under Rule 12(b)(6) for the reasons set forth in the motion of defendants James R. McGonigle and Longport, Inc., filed on June 19, 1996; and finally, on the grounds of forum non conveniens.

After permitting the parties roughly three months to conduct limited discovery into the jurisdictional issues raised by the UMDS Defendants' motions, and upon considering the parties' legal memoranda, affidavits, and oral argument to the Court on January 17, 1997, the Court will deny the UMDS Defendants' 12(b)(1), 12(b)(2), 12(b)(5), and forum non conveniens motions for the reasons set forth in this Memorandum. By Order dated today, the Court will also deny the UMDS Defendants' Rule 12(b)(6) motion.

## I. Background

Based on the exhibits and affidavits submitted to the Court in connection with the UMDS Defendants' motions to dismiss, the Court summarizes the factual contentions of the parties as follows: The Plaintiff Supra Medical Corp. was incorporated in Delaware in 1985 under the name Ventnor Corporation and is located in Chadds Ford, Pennsylvania. The Plaintiff was listed on the American Stock Exchange in 1992 as Topox, Inc., and later that year changed its name to the current Supra Medical Corp.

In 1990, the Plaintiff acquired patents and patent applications to certain medical scanner technology for use in treating wounds, skin ulcerations, and pressure sores. In 1991, the Plaintiff acquired the patents, licenses and technology to the Supra Scanner, a medical device proposed for use in diagnosing skin cancers, burns, and other types of wounds. One key element of the Supra Scanner, however, was acquired under an exclusive sublicense agreement with the National Aeronautics and Space Administration. Plaintiff's Exh. 39 (Supra Medical Corp.1993 Annual Report).

The Supra Scanner combines ultrasound, voice-activation, and computer technology in a single instrument to produce high resolution monochromatic or color images of skin tissue up to approximately 1.5 inches beneath the skin. Such technology permits physicians to assess skin wounds without resorting to exploratory surgery.

Plaintiff alleges the following scheme by the Defendants to misappropriate its technology: Defendants James McGonigle and Philip Loori were officers and directors of the Plaintiff at the time it acquired patents and patent applications for the Supra Scanner technology in 1991. Soon thereafter, the Plaintiff; Defendant United Medical and Dental Schools of Guy's and St. Thomas's Hospitals; and Defendant Dr. Mary Dyson, the chair of the Schools' Division of Anatomy and Tissue Repair Unit, agreed to establish a program in England to test the efficacy of the Supra Scanner and ultimately establish "wound healing centers" utilizing the Supra Scanner.

To accomplish this goal the Plaintiff provided $50,000 and several Supra Scanner devices to the Schools, entered into an "Agreement in Principle" in late 1992, and

established a U.K. company called Supra Medical International, Ltd. The Plaintiff also accepted Defendant Dyson as a member of its Board of Directors. Over the next year, Dr. Dyson and the Schools tested the Supra Scanner, engaging the services of Defendant Hugh Lewis as an independent contractor. Defendant Lewis entered into a confidentiality agreement with Supra Medical on June 8, 1993, executed by him and Defendant Dyson as chairman and executive officer of Supra Medical International, Ltd. Defendant Lewis later refused to sign a similar agreement acknowledging that all work he performed would be the property of the Plaintiff.

At about the same time that the Plaintiff was establishing a relationship with the UMDS Defendants in 1992, Defendants McGonigle and Loori resigned as officers and directors of Plaintiff and sold most of their shares in Plaintiff's common stock. According to the Plaintiff, Defendants McGonigle and Loori soon thereafter established their own corporation, Defendant Longport, Inc., to pursue the same line of business.

In 1994, Defendants McGonigle and Loori proposed a joint venture between Longport and the Plaintiff regarding the Supra Scanner technology. The Plaintiff apparently declined this offer. Immediately thereafter, Defendant Dyson resigned from Plaintiff's board of directors and made a presentation of the Supra Scanner to one of Plaintiff's competitors over Plaintiff's objections. Plaintiff alleges that Dyson also engaged in business discussions with Longport.

In 1995, Defendants McGonigle, Loori, and Longport announced a joint venture with the UMDS Defendants to establish wound healing clinics using medical devices which the Plaintiff claims incorporate its Supra Scanner proprietary technology. Longport and the UMDS defendants are currently developing and testing a medical scanner device at wound healing centers in England and the United States. *See* Plaintiff's Exhs. 53–59.

The Plaintiff filed this action on May 16, 1996, alleging that from in or about 1992, the UMDS Defendants and Defendants McGonigle, Loori, and Longport devised and joined in a scheme to misappropriate the Plaintiff's Supra Scanner technology. The complaint alleges mail and wire fraud violations as well as interstate transportation of stolen property. The Plaintiff seeks damages in excess of $7 million and a permanent injunction against the Defendants from utilizing or profiting from the Plaintiff's technology.

## II. Defendants' Rule 12(b)(1) Motion to Dismiss Under the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602–11

The UMDS Defendants argue that the Foreign Sovereign Immunities Act ("FSIA" or "Act"), 28 U.S.C. §§ 1602–1611, gives them immunity from this Court's jurisdiction. Section 1604 of the Act provides that "a foreign state shall be immune from the jurisdiction of the courts of the United States...." Moreover, the UMDS Defendants argue that the "commercial activity exception" to the FSIA, § 1605(a)(2), does not strip them of their immunity.

The FSIA codifies the State Department's previous practice of granting foreign nations immunity from suit in the United States. *Verlinden B.V. v. Central Bank of Nigeria,* 461 U.S. 480, 488, 103 S.Ct. 1962, 1968–69, 76 L.Ed.2d 81 (1983). "Congress passed the Foreign Sovereign Immunities Act [in 1976] in order to free the Government from the case-by-case diplomatic pressures, to clarify the governing standards, and to 'assur[e] litigants that ... decisions are made on purely legal grounds and under procedures that insure due process.'" *Id.* "To accomplish these objectives, the Act contains a comprehensive set of legal standards governing claims of immunity in every civil action against a foreign state or its political subdivisions, agencies or instrumentalities." *Id.*

Motions to dismiss under the FSIA must be brought pursuant to Fed.R.Civ.P. 12(b)(1) because the Act raises a question of the court's subject matter jurisdiction. The FSIA "provides the sole basis for obtaining jurisdiction over a foreign state in the courts of this country." *Saudi Arabia v. Nelson,* 507 U.S. 349, 355, 113 S.Ct. 1471, 1476, 123 L.Ed.2d 47 (1993) (quoting *Argentine Republic v. Amerada Hess Shipping Corp.,* 488 U.S. 428, 433, 109 S.Ct. 683, 687–88, 102

L.Ed.2d 818 (1989)). Unless an exception to the FSIA applies, a court lacks subject matter jurisdiction over a claim against a foreign state or its agency or instrumentality. *Saudi Arabia,* 507 U.S. at 354–55, 113 S.Ct. at 1476 (citing *Verlinden,* 461 U.S. at 488–89, 103 S.Ct. at 1968–69); *Federal Insur. Co. v. Rubin,* 12 F.3d 1270, 1279 & 1284 n. 13 (3d Cir.1993); *Foremost–McKesson v. Islamic Republic of Iran,* 905 F.2d 438, 442 (D.C.Cir. 1990).

In *Verlinden,* the Supreme Court upheld the constitutionality of the FSIA under both Articles I and III of the United States Constitution. First, the Court concluded that Congress could restrict actions involving foreign states under its express authority in Article I to regulate foreign commerce. The Act "governs the types of actions for which foreign sovereigns may be held liable in a court in the United States, federal or state." *Verlinden,* 461 U.S. at 496–97, 103 S.Ct. at 1973. Second, the Court held that the FSIA's jurisdictional grant to federal courts complies with Article III, since every action against a foreign sovereign involves a question of substantive federal law and therefore "arises under" federal law. *Id.* at 497, 103 S.Ct. at 1973.

When moving to dismiss under the FSIA, the defendant bears the initial burden of making a *prima facie* showing that it is a "foreign state" or "agency or instrumentality" of a foreign state and thus enjoys sovereign immunity. *Federal Insur. Co.,* 12 F.3d at 1285 n. 13. The burden then shifts to the plaintiff to produce evidence establishing that the foreign state is not entitled to immunity under one of the exceptions in § 1605. The ultimate burden of proving immunity, however, rests with the party claiming that it is an agency or instrumentality of a foreign state. *Id.*

Accordingly, this Court must undertake a two-step inquiry in deciding the UMDS Defendants' Rule 12(b)(1) motion to dismiss. First, under § 1603, are the UMDS Defendants a foreign state or agency or instrumentality of a foreign state? Second, if so, are the UMDS Defendants stripped of their immunity by the "commercial activity" exception of § 1605(a)(2)?

The Court must also consider whether individual persons employed by an agency or instrumentality of a foreign state enjoy the same immunity as foreign states under the FSIA. While the Third Circuit has not directly ruled on this issue, other courts have held that individual persons acting in their official capacities as agents or employees of a foreign agency are entitled to immunity. *See, e.g., Chuidian v. Philippine National Bank,* 912 F.2d 1095, 1099–1103 (9th Cir. 1990). Accordingly, the Court must first examine whether the Schools are entitled to sovereign immunity, and if so, then whether Defendants Dyson and Lewis were acting in their official capacities under a duty to the Schools.

No party in this case claims that the Schools are a foreign state. Therefore, the Court must examine whether the Schools qualify as an agency or instrumentality of a foreign state. Section 1603(b) of the FSIA provides that an "agency or instrumentality of a foreign state" means any entity:

(1) which is a separate legal person, corporate or otherwise, and

(2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and

(3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (d) of this title, nor created under the laws of any other third country.

The Plaintiff does not dispute that UMDS meets the first and third requirements, and the Court need not address these issues. The key inquiry is in § 1603(b)(2), the "organ of a foreign state" or ownership requirement.

 The UMDS Defendants have provided no evidence of UMDS' ownership, relying instead on a claim that the Schools' qualify for immunity as an "organ of a foreign state." According to the few federal courts who have examined the "organ of a foreign state" prong of § 1603(b)(2)—as opposed to the much more common "majority ownership" prong—there is no clear test to determine

whether an entity qualifies as an "organ of a foreign state." Instead, courts consider several factors: (1) whether the foreign state created the entity for a national purpose; (2) whether the foreign state actively supervises the entity; (3) whether the foreign state requires the hiring of public employees and pays their salaries; (4) whether the entity holds exclusive rights to some right in the country; and (5) how the entity is treated under foreign state law. *Corporacion Mexicana de Servicios Maritimos, S.A. v. M/T Respect*, 89 F.3d 650, 654-55 (9th Cir.1996); *Intercontinental Dictionary Series v. De Gruyter*, 822 F.Supp. 662, 673 (C.D.Cal.1993).

■ Applying these factors to the exhibits and affidavits provided by the UMDS Defendants, the Court concludes that UMDS does not qualify as an organ of the British government. Defendants argue that UMDS was created by an act of Parliament, receives approximately 70 percent of its funding from the British government, and must account to the government for spending these funds. These factors, however, without more, do not establish that UMDS is an organ of the British government.

First, as provided by UMDS Defendants' own exhibits, the purpose of the Schools is to teach and train medical practitioners and dental surgeons and promote research in these disciplines. *See* Aff. of Harry Thomas Musselwhite, Exh. HTM2, ¶ 2. The UMDS Defendants have supplied no evidence that these goals serve any peculiar national or governmental purpose in Great Britain. Second, there is no evidence that the government actively supervises the Schools or requires them to hire public employees. Third, the Schools serve as only one source of medical and dental education in the United Kingdom; they hold no exclusive rights.

Finally, and most importantly, British law apparently treats the Schools as independent from the British government. The Schools' bylaws state that "The Governing Body of the Schools shall be a *body corporate* and shall be called 'The Council of Governors' and *may sue and be sued by that name*." *See* Aff. of Harry Thomas Musselwhite, Exh. HTM2, ¶ 3 (emphasis added). Moreover, un-

der British law, the Schools' "Council of Governors" is selected by private officials within the Schools and is responsible for the Schools' debts, contractual obligations, and lawsuits. The British government has no apparent control over or responsibility for these affairs. *See* Aff. of Harry Thomas Musselwhite, Exh. HTM1 (United Medical and Dental Schools Act 1990), part II, ¶¶ 5 & 6; Exh. HTM2, ¶¶ 4, 24, 31.

The UMDS Defendants' affidavits offering the legal opinions of British solicitors that UMDS qualifies as an "organ" of the British government under the FSIA provide little more support than their American counsel's similar arguments. These Schools were founded in 1550 and 1769, and this Court takes great notice that the UMDS Defendants have failed to provide even one rule of law in the past 200 years from England or the United States which holds that the Schools are agencies or instrumentalities of the British government cloaked with the sovereign's immunity. The UMDS Defendants' assertions that the Schools were created by an Act of Parliament and receive the majority of their funding from the state are insufficient to provide them with sovereign immunity under the FSIA. In short, the UMDS Defendants have failed to meet their burden of making a *prima facie* showing that UMDS is an agency or instrumentality of a foreign state. *Federal Insur. Co.*, 12 F.3d at 1285. Accordingly, the Court holds that UMDS does not qualify for immunity under the FSIA as an organ of a foreign state, and therefore, neither do individual Defendants Dyson and Lewis as agents of UMDS.

Even assuming that UMDS were entitled to immunity as an agency or instrumentality of the British government, however, the FSIA's commercial activity exception would strip the UMDS Defendants of such immunity. Section 1605(a)(2) of the FSIA provides:

A foreign state shall not be immune from the jurisdiction of courts of the United States ... in any case—in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state else-

where; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

The FSIA defines the term "commercial activity" as "either a regular course of commercial conduct or a particular commercial transaction or act," and requires such activity to have "substantial contact" with the United States. 28 U.S.C. § 1603(d) & (e).

■ The Third Circuit has set forth a two-part test to analyze the FSIA's commercial activity exception:

> Under this test, the initial inquiry is whether there is a sufficient jurisdictional connection or nexus between the commercial activity and the United States. The second inquiry is whether there exists a substantive connection or nexus between the commercial activity and the subject matter of the cause of action.

*Federal Insur. Co.,* 12 F.3d at 1286. In other words, the foreign state must have carried on commercial activity directly in the United States or with a substantial connection to the United States *and* that activity must serve as the basis for the lawsuit. *Id.*

■ Applying this test to the facts of this case, UMDS has carried on commercial activity directly in the United States. or with a substantial connection to the United States. First, UMDS' testing of the medical equipment qualifies as "commercial" activity, not simply academic research as Defendants claim. UMDS served in the same capacity as would Plaintiff's own or another firm's private research lab. A foreign state "engages in commercial activity ... where it acts 'in the manner of a private player' within the market." *Saudi Arabia,* 507 U.S. at 360, 113 S.Ct. at 1479 (citation omitted). UMDS' actions "(whatever the motive behind them) are the *type* of actions by which a private party engages in 'trade and traffic or commerce.'" *Id.* (citing *Republic of Argentina v. Weltover, Inc.,* 504 U.S. 607, 614, 112 S.Ct. 2160, 2166, 119 L.Ed.2d 394 (1992)).

The Court also finds that UMDS' commercial activity falls within the exceptions provided in § 1605(a)(2) of the FSIA. Plaintiff and UMDS initially agreed to establish wound treatment centers in England in order to test a United States corporation's product. UMDS' testing of the Plaintiff's medical device in Great Britain is a commercial activity performed outside the United States which has a direct effect within the United States. Moreover, both the Supra–UMDS and the Longport–UMDS agreements contemplated the establishment of wound treatment centers here in the United States. This is a commercial activity carried on in the United States and in connection with a commercial activity performed elsewhere. *See* Plaintiff's Exhs. 20, 52–59.

Finally, the UMDS Defendants' commercial activities clearly serve as the basis for this RICO suit. The Plaintiff's cause of action is based upon UMDS' testing and alleged subsequent misappropriation of the Plaintiff's Supra Scanner technology. Therefore, UMDS has carried on a commercial activity in the United States or with a substantial connection to the United States, and its activities serve as the basis for this lawsuit. *Federal Insur. Co.,* 12 F.3d at 1286.

Accordingly, the Court will deny the UMDS Defendants' Rule 12(b)(1) motion on the grounds that, given the evidence provided to this Court, UMDS fails to qualify as an organ of the British government protected by sovereign immunity under the Foreign Sovereign Immunities Act. Even assuming UMDS did qualify for such immunity, however, the UMDS Defendants would be subject to suit under the FSIA's commercial activity exception because the Plaintiff's cause of action is based upon UMDS' commercial activities which are substantially connected to the United States.

### III. Rule 12(b)(2) Motion to Dismiss for Lack of Personal Jurisdiction over UMDS, Dr. Dyson, and Hugh Lewis

■ Defendants UMDS, Dyson, and Lewis move to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(2) for lack of personal jurisdiction. Each is a resident of the United Kingdom. For the reasons set forth below, the Court finds that it may exercise specific personal jurisdiction over each of the UMDS Defendants.

A federal court looks to the law of the state in which it sits when determining whether it may exercise personal jurisdiction over a defendant. Fed.R.Civ.P. 4(e). Thus, this Court looks to the Pennsylvania Long Arm Statute, 42 Pa.C.S.A. §§ 5301 et seq. (Purdon's 1981). *Time Share Vacation Club v. Atlantic Resorts, Ltd.*, 735 F.2d 61, 63 (3d Cir.1984). The exercise of personal jurisdiction, however, must also comply with the constitutional requirements of due process of law. Personal jurisdiction is constitutional so long as each defendant had minimum contacts with the forum state and exercising jurisdiction would not "offend traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945) (citations omitted).

The present case raises a question of specific rather than general jurisdiction. General jurisdiction requires the defendant to have engaged in "continuous and systematic" contacts with the forum. 42 Pa.C.S.A. § 5301(a) (Purdon's 1981); *Vetrotex Certainteed Corp. v. Consolidated Fiber Glass Products Co.*, 75 F.3d 147, 151 n. 3 (3d Cir.1996) (citations omitted). Specific jurisdiction, on the other hand, may be "invoked when the cause of action arises from the defendant's forum related activities." *Id.* at 151.

The Court may not assert general jurisdiction over the UMDS Defendants because they are not residents or domiciles of the Commonwealth, have not consented to suit in the Commonwealth, and have not engaged in continuous and systematic business activities here. 42 Pa.C.S.A. § 5301(a) (Purdon's 1981). Therefore, the Court must consider whether it may exercise specific jurisdiction over each of the UMDS Defendants. 42 Pa.C.S.A. § 5322 (Purdon's 1981). In doing so, the Court limits its review to the UMDS Defendants' forum-related activities which give rise to the Plaintiff's cause of action.

"Once a jurisdictional defense has been properly raised, 'the plaintiff bears the burden of demonstrating contacts with the forum state sufficient to give the court in personam jurisdiction.'" *Time Share Vacation*, 735 F.2d at 63 (citation omitted). After the plaintiff sets forth facts sufficient to establish personal jurisdiction by a preponderance of the evidence, the burden then shifts to the defendant to show an absence of fairness or lack of substantial justice in exercising jurisdiction. *Grand Entertainment Group, Ltd. v. Star Media Sales, Inc.*, 988 F.2d 476, 483 (3d Cir.1993); *Carteret Savings Bank v. Shushan*, 954 F.2d 141, 146 (3d Cir.1992).

The Pennsylvania Long Arm Statute enumerates several bases for exercising specific personal jurisdiction over persons outside the Commonwealth. 42 Pa.C.S.A. § 5322(a) (Purdon's 1981). Two of these provisions appear most applicable in the present case: (1) the "tort-out/harm-in" provision, which gives Pennsylvania courts a basis to exercise jurisdiction whenever a defendant causes "harm or tortious injury in this Commonwealth by an act or omission outside this Commonwealth;" and (2) the provision granting jurisdiction over a defendant who accepts election as a director of a corporation in Pennsylvania. 42 Pa.C.S.A. § 5322(a)(4) & (7)(iv) (Purdon's 1981).

At the heart of Plaintiff's RICO claim are allegations that UMDS, Dr. Dyson, and Hugh Lewis caused harm inside Pennsylvania by committing acts outside Pennsylvania, namely, misappropriating the Plaintiff's trade secrets or confidential business information while testing its proprietary technology in England. Such acts amount to a common law tort recognized in Pennsylvania. *See, e.g., Den–Tal–Ez, Inc. v. Siemens Capital Corp.*, 389 Pa.Super. 219, 566 A.2d 1214 (1989); Restatement Torts §§ 757, 759. *See also* Restatement Third, Unfair Competition §§ 38–45. Moreover, Defendant Dyson's service on the Plaintiff's board of directors provides an additional basis for exercising jurisdiction over her, since Plaintiff alleges that her role on Supra's board placed her in a position to further the Defendants' RICO scheme.

■ As the foregoing discussion demonstrates, the UMDS Defendants' activities provide a sufficient statutory basis for this Court to exercise specific personal jurisdiction over them under Pennsylvania law. However, the UMDS Defendants must also have made minimum contacts with this forum in order to satisfy the constitutional require-

ment of due process. 42 Pa.C.S.A. § 5322(b) (Purdon's 1981); *International Shoe,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945).

The Court must undertake a two-step inquiry in the due process analysis: (1) has the defendant made constitutionally sufficient "minimum contacts" with the forum?; and (2) would exercising jurisdiction over that defendant comport with "traditional notions of fair play and substantial justice?" Under the "minimum contacts" prong, the defendant must have "purposefully directed" its activities toward the forum, thus availing itself of the benefits and protections of the forum's laws, such that it should "reasonably anticipate being haled into court there." *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 472–77, 105 S.Ct. 2174, 2181–85, 85 L.Ed.2d 528 (1985) (citations omitted). Under the "fairness" prong, the court must balance, inter alia, the burden on the defendant in defending the suit in the forum, the forum state's interest in adjudicating the dispute, and the plaintiff's interest in obtaining convenient and effective relief. *Burger King,* 471 U.S. at 478, 105 S.Ct. at 2185; *Grand Entertainment Group,* 988 F.2d at 483.

Applying these factors to the UMDS Defendants, the Court finds that exercising jurisdiction over each of the UMDS Defendants complies with constitutional principles guaranteeing due process. First, each UMDS Defendant has sufficient minimum contacts with Pennsylvania to enable this Court to exercise personal jurisdiction over them. Defendants UMDS and Dyson entered into an "Agreement in Principle" with the Plaintiff which contemplated significant ties with the forum. While a contract is insufficient in itself to establish minimum contacts, *see Grand Entertainment Group,* 988 F.2d at 482 (citing *Burger King,* 471 U.S. at 478–79, 105 S.Ct. at 2185–86), the present agreement contemplated an ongoing business relationship between UMDS, Dr. Dyson, and the Plaintiff in which the parties would collaborate to develop the Supra Scanner for commercial use in England, the United States, and Europe. Moreover, the parties actually did engage in this business relationship for roughly two years. Dr. Dyson and UMDS, through its director of finance, David Mor-

ton, directed more than a dozen communications to the forum and visited Plaintiff's offices here. *See* Plaintiff's Exhs. 14–16, 18, 20, 22, 24, 25, 27, 30, 31, and 35–38. An agent's contacts with the forum count towards the minimum contacts necessary to support jurisdiction. *Grand Entertainment,* 988 F.2d at 483 (citations omitted). Dr. Dyson also served as one of Plaintiff's directors and attended a board meeting here in Pennsylvania.

Turning to Defendant Lewis, the Court finds that he also has minimum contacts with Pennsylvania. Although Defendant Lewis served as an independent contractor for Supra Medical and apparently never travelled to Pennsylvania, evidence shows that he purposely directed his activities toward this forum. Defendant Lewis signed a confidentiality agreement with the Plaintiff's subsidiary for technology clearly controlled by a Pennsylvania corporation, and he directed at least four communications to the Plaintiff in Pennsylvania involving a dispute about compensation and property rights for his experiments. *See* Aff. of Evelyna Dyson–Cantwell, p. 2; Plaintiff's Exhs. 41–44. Even though Defendant Lewis had entered into a contract and signed a confidentiality agreement with the Plaintiff's British subsidiary, he understood that his responsibilities were controlled by Plaintiff's officers here in Pennsylvania.

Accordingly, each of the UMDS Defendants has "minimum contacts" with Pennsylvania. Each defendant purposefully directed its activities toward Pennsylvania such that it should have reasonably anticipated being haled into court here. Moreover, the Plaintiff's cause of action arises directly out of the contacts at issue. "Where the contacts evaluated are those that give rise to the litigation, even one contact with the forum may be enough to justify jurisdiction so long as the other criteria are met." *Grand Entertainment,* 988 F.2d at 483 (citing *Burger King,* 471 U.S. at 475 n. 18, 105 S.Ct. at 2184 n. 18). The Schools', Dr. Dyson's, and Hugh Lewis' personal, intentional communications with the Plaintiff give rise to the underlying suit. *Id.* They each voluntarily negotiated with the Plaintiff and "cannot now be heard to complain about answering a suit concerning

the effect of negotiations in the jurisdiction in which some of those negotiations occurred." *Id.*

Turning to the fairness analysis, the Court concludes that exercising jurisdiction over each of the UMDS Defendants comports with "traditional notions of fair play and substantial justice." The UMDS Defendants have failed to "present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Grand Entertainment Group*, 988 F.2d at 483 (quoting *Carteret Savings Bank*, 954 F.2d at 150).

The Supreme Court has recognized that, although the burden of defending a lawsuit in a foreign land is significant, this burden is often outweighed by the interests of the plaintiff and the forum in the exercise of jurisdiction. *Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 114, 107 S.Ct. 1026, 1033, 94 L.Ed.2d 92 (1987). Such is the case here. The burden on the UMDS defendants of litigating this case in Pennsylvania is outweighed by the Commonwealth's interest in protecting the property rights of corporations located here. Pennsylvania courts have recognized a state interest where a foreign corporation enters into obligations which have an economic impact on state commerce. *Grand Entertainment*, 988 F.2d at 484 n. 4 (citations omitted).

Moreover, several of the other defendants named by the Plaintiff in this lawsuit are located within or near Pennsylvania. Requiring the Plaintiff to seek relief in England or pursue some defendants there and others in Pennsylvania would prevent the Plaintiff from obtaining convenient and effective relief. The Court therefore concludes that the UMDS Defendants have not met their burden of showing that defending themselves in Pennsylvania would be so unreasonable as to deprive them of constitutional notions of fair play and substantial justice. *Id.*

Accordingly, because this Court may exercise personal jurisdiction over each of the UMDS Defendants, the Court will deny the UMDS Defendants' motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(2).

## IV. Defendants' Rule 12(b)(5) Motion to Dismiss for Failure to Comply with the Hague Convention

■ The UMDS Defendants argue that this Court should dismiss the complaint as to them because the Plaintiff failed to serve them in conformity with the Hague Convention. Defendants claim that Articles 3 and 5 of that treaty require the Plaintiff to utilize the Central Authority of the United Kingdom, and that Plaintiff's failure to do so makes service on the UMDS Defendants ineffective.

While the Hague Convention is clearly relevant to service on foreign defendants under Fed.R.Civ.P. 4(f), the Court finds no support for Defendants' proposition that Plaintiff must use the United Kingdom's Central Authority to effectuate service. The most recent amendments to Rule 4 specifically provide that service may be effected "in the manner prescribed by the law of the foreign country for service in that country" so long as such service is reasonably calculated to give notice and the Hague Convention allows other means of service. Fed.R.Civ.P. 4(f)(2)(A).

The Hague Convention clearly permits service by means other than through a foreign state's Central Authority. Article 10 of the Hague Convention states that persons may effect service through the judicial officers, officials, or other competent persons of the State of destination provided the State does not object. *See* Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters (the "Hague Convention"), Art. 10 (provided in Plaintiff's Exh. 60). The Third Circuit has also ruled that the Hague Convention "allows service to be effected without utilizing the Central Authority as long as the nation receiving service has not objected to the method used." *DeJames v. Magnificence Carriers, Inc.*, 654 F.2d 280, 288 (3d Cir.1981).

In the present case, the Court finds that Plaintiff served its complaint in accordance with United Kingdom law and notions of due process. Plaintiff utilized the services of a U.K. solicitor who personally served Dr. Dyson and Hugh Lewis and served UMDS' legal representative. These defendants ac-

cepted such service. *See* Plaintiff's Exh. 60; Aff. of Jonathan L. Rosner, pg. 5. Plaintiff has provided the Court with letters from the deputy secretary general of the Hague Conference and an official from the United Kingdom's Foreign and Commonwealth Office confirming that service may be effected in the United Kingdom through use of a solicitor there. *See* Plaintiff's Exh. 60.

Because the Hague Convention and the United Kingdom permit service to be effectuated in that country through the use of a solicitor, and because the Court finds that such service comports with notions of due process, the Court concludes that Plaintiff's service of the UMDS Defendants was proper under Rule 4(f) of the Federal Rules of Civil Procedure. Accordingly, the Court will deny the UMDS Defendants' motion to dismiss pursuant to Rule 12(b)(5) for insufficient service of process.

## V. Defendants' Motion to Dismiss on the Grounds of Forum Non Conveniens

■ The UMDS Defendants also seek to dismiss this action based on the doctrine of forum non conveniens as set forth in *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947), and its progeny. Under this doctrine, district courts in their discretion may dismiss an action because the chosen forum, while proper, is inconvenient.

"It is settled that the defendant bears the burden of persuasion as to all elements of the forum non conveniens analysis.". *Lacey v. Cessna Aircraft Co.,* 932 F.2d 170, 180 (3d Cir.1991). In order to meet this burden, the defendant must first establish that an adequate alternative forum exists as to all defendants, and second that both public and private interest factors weigh heavily in favor of dismissing the case. *Id.* These factors include, inter alia, relative ease of access to sources of proof, availability of compulsory process, and the interest of having the trial in a forum that is home to the law that governs the action. *Id.* (citing *Piper Aircraft v. Reyno,* 454 U.S. 235, 241, 102 S.Ct. 252, 258, 70 L.Ed.2d 419 (1981); *Gulf Oil,* 330 U.S. at 508–09, 67 S.Ct. at 843).

In the instant case, the Court concludes that the UMDS Defendants have not met their initial burden of establishing that an adequate alternative forum exists. First, a resident plaintiff's choice of its home forum is entitled to great deference. *Piper,* 454 U.S. at 255–56, 102 S.Ct. at 265–66. Second, three of the defendants reside in the United States, and two of them are located here in Pennsylvania. These U.S. defendants, James McGonigle, Philip Loori, and Longport, Inc., play principal roles in the Plaintiff's complaint, which alleges that these two former officers of the Plaintiff engaged in a scheme to misappropriate its proprietary medical scanner technology for their benefit and for defendant Longport's benefit. Moreover, it is not clear that the Plaintiff could sue these U.S. defendants in a British court, as the UMDS Defendants would like, or even that the Plaintiff could receive an adequate remedy under British law. *Piper,* 454 U.S. at 254–255, 102 S.Ct. at 265–66.

Even assuming that Great Britain provides an adequate alternative forum for Plaintiff's suit, however, the relevant private and public factors weigh heavily against dismissing this case. As discussed above, the three United States defendants play principal roles in Plaintiff's allegations, and evidence of their actions and witnesses thereto are most easily obtained in this forum. Moreover, to the extent that a corporation located in Pennsylvania alleges misappropriation of its trade secrets and confidential business records, the Plaintiff and the Commonwealth have strong interests in having this dispute litigated here. Finally, the courts of the United States, not Great Britain, are best suited to entertain an action based solely on United States law such as the present RICO action. *See Gulf Oil,* 330 U.S. at 509, 67 S.Ct. at 843.

Accordingly, because the UMDS Defendants have not met their burden of establishing an adequate alternative forum and because the public and private interest factors enunciated by the Supreme Court weigh against dismissing this case, the Court will deny the UMDS Defendants' motion to dismiss on the grounds of forum non conveniens.

For the foregoing reasons, the Court will deny the UMDS Defendants' motions to dis-

miss pursuant to Rules 12(b)(1), 12(b)(2), and 12(b)(5) of the Federal Rules of Civil Procedure and also on the grounds of forum non conveniens.

An appropriate Order follows.

## ORDER

AND NOW, this 31st day of January, 1997; for the reasons set forth in the Court's Memorandum issued the same day;

IT IS ORDERED: The motions to dismiss of the United Medical and Dental Schools of Guy's and St. Thomas's Hospitals, Dr. Mary Dyson, and Hugh Lewis pursuant to Fed. R.Civ.P. 12(b)(1), 12(b)(2), and 12(b)(5), as well as on the grounds of forum non conveniens (Document No. 7), filed July 3, 1996, are *DENIED*;

IT IS FURTHER ORDERED: The motion of the UMDS defendants to dismiss pursuant to Rule 12(b)(6) (Document No. 7), filed July 3, 1996, is *DENIED* for the reasons set forth in the Court's Order dated January 31, 1997, denying the same motion of Defendants James R. McGonigle and Longport, Inc. (Document No. 4) in this case.