UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 99-20095

_____

ANNIE KELLY; JEANETTE CARPENTER,

Plaintiffs-Appellants,

versus

SYRIA SHELL PETROLEUM DEVELOPMENT B.V., ET AL.,

Defendants,

SYRIA SHELL PETROLEUM DEVELOPMENT B.V.;
AL FURAT PETROLEUM COMPANY;
N. V. KONINKLIJE NEDERLANDSCHE PETROLEUM
MATSENAPPIJ; ROYAL DUTCH PETROLEUM;
THE SHELL TRANSPORT AND TRADING COMPANY,

Defendants-Appellees.

_____

KATHY STRONG, Individually and as
Next Friend of John Strong, a minor,

Plaintiff-Appellant,

versus

SYRIA SHELL PETROLEUM DEVELOPMENT B.V.; ET AL.,

Defendants,

SYRIA SHELL PETROLEUM DEVELOPMENT B.V.;
AL FURAT PETROLEUM COMPANY; N. V. KONINKLIJE
NEDERLANDSCHE PETROLEUM MATSENAPPIJ, also
known as Royal Dutch Petroleum Company;
THE SHELL TRANSPORT AND TRADING COMPANY,

Defendants-Appellees.

_____

_____
May 31, 2000

Before BARKSDALE, BENAVIDES, and STEWART, Circuit Judges.

RHESA HAWKINS BARKSDALE, Circuit Judge:

Primarily at issue are whether, pursuant to the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. §§ 1330, 1602-11, Al Furat Petroleum Company is an "organ" of Syria for purposes of defeating subject matter jurisdiction; and, if it is, whether immunity is precluded by the FSIA commercial activity exception, 28 U.S.C. § 1605(a)(2). The district court dismissed Al Furat for lack of subject matter jurisdiction; the other Appellees, for lack of personal jurisdiction. As part of contesting those dismissals, Appellants maintain they were denied adequate discovery. We **AFFIRM**.

I.

On 3 May 1995, a Syrian well, operated by Al Furat Petroleum Company, began leaking oil and gas. That same day, Warmenhoven, who was employed in The Netherlands by SIPM, one of the Royal Dutch/Shell group of companies, called Boots & Coots, L.P. (B&C) in Houston, Texas, to determine its availability to perform well control services.

The call was routed to John Wright, of Wright, Boots & Coots, L.L.C. (WB&C), also in Houston, who confirmed WB&C's availability. Warmenhoven explained that he did *not* have authority to hire WB&C,

2

but told Wright he would suggest that Al Furat contact WB&C. When deposed concerning jurisdiction for this action, discussed *infra*, Wright described Warmenhoven as a "worldwide drilling troubleshooter" who advised operating units on mobilization of resources.

Wright proposed to Al Furat that he (Wright), as blowout adviser, and three firefighters (Appellants' decedents) travel to Syria to perform well control services. After receiving confirmation from Al Furat on fees for such services, Wright and Appellants' decedents traveled to Syria that same day.

On 5 May, two days after the leak began and Wright was contacted, Al Furat signed a B&C work order, for B&C, as an independent contractor, to assist in bringing the well under control. The work order gives Al Furat complete authority, dominion, and control over the well site; and Al Furat agreed to indemnify B&C for personal injury claims and to pay it in Houston. (The evidence submitted by Appellants shows that B&C invoiced WB&C for decedents' services; and that Al Furat was invoiced by, and paid, WB&C for the work performed by decedents.)

Subsequently, Al Furat contracted with WB&C for it to perform blowout response and well killing services. The contract, signed in Syria on 10 and 11 June, but effective as of 3 May, provided: Syrian law governed; Al Furat had complete custody of the well site; WB&C was an independent contractor; Al Furat was to defend

3

and indemnify WB&C for personal injuries to personnel of Al Furat and other contractors attributable to activities at the site; WB&C was responsible for, and would defend and indemnify Al Furat and other contractors for, personal injuries to WB&C and subcontractor personnel attributable to activities at the site; on written request of Al Furat, WB&C could be asked to place purchase orders on behalf of Al Furat for equipment or materials; and preference was to be given to Syrian products and subcontractors.

On 10 June, Appellants' decedents died when gas escaping from the well ignited. Two years later, decedents' wrongful death beneficiaries filed two actions in Texas state court (one by Strong's beneficiaries, the other by Kelly and Carpenter's) against Al Furat, Syria Shell Petroleum Development B.V. (Syria Shell), Royal Dutch Petroleum Company (Royal Dutch), The Shell Transport and Trading Company (Shell Transport), and others, claiming their negligence and gross negligence caused the three deaths. Appellees removed both actions to federal court. Approximately two weeks later, Appellees moved in both actions for Al Furat's dismissal for lack of subject matter jurisdiction, claiming FSIA immunity, and for all Appellees' dismissal for lack of personal jurisdiction. They also moved to stay discovery pending disposition of their motions.

The two actions were later consolidated, over Appellants' objections. In December 1997, approximately six months after

4

filing the actions, Appellants moved to conduct jurisdictional discovery on FSIA issues. The following January, they moved to compel discovery on personal jurisdiction, and requested a delay in ruling on dismissal pending discovery. That February, Appellants amended their complaints to claim Al Furat breached its contracts with WB&C and B&C.

The magistrate judge to whom all of the motions were referred recommended dismissal and staying discovery. The district court overruled Appellants' objections; adopted the recommendations; and denied Appellants' motions for reconsideration. (Prior to Appellees' dismissal, the other defendants had been dismissed.)

## II.

Appellants challenge Al Furat's dismissal under the FSIA for lack of subject matter jurisdiction and that of Syria Shell, Royal Dutch, and Shell Transport for lack of personal jurisdiction. Concomitantly, they claim denial of adequate jurisdictional discovery.

### A.

Al Furat's dismissal is reviewed *de novo*. *E.g., **Moran v. Kingdom of Saudi Arabia***, 27 F.3d 169, 171 (5th Cir. 1994); ***Walter Fuller Aircraft Sales, Inc. v. Republic of Philippines***, 965 F.2d 1375, 1383 (5th Cir. 1992) ("We review the district court's conclusions about sovereign immunity *de novo*.").

> A court may base its disposition of a motion
> to dismiss for lack of subject matter

5

jurisdiction on (1) the complaint alone; (2) the complaint supplemented by undisputed facts; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts. Where ... the district court has relied on the third of these bases and has made jurisdictional findings of fact, those findings are reviewed for clear error.

*Robinson v. TCI/US West Cable Communications Inc.*, 117 F.3d 900, 904 (5th Cir. 1997) (footnotes omitted).

Concerning Al Furat, "[t]he FSIA sets forth 'the sole and exclusive standards to be used' to resolve all sovereign immunity issues". *Arriba Ltd. v. Petroleos Mexicanos*, 962 F.2d 528, 532 (5th Cir.) (quoting H.R. REP. NO. 1487, 94th Cong., 2d Sess. 12 (1976), 1976 U.S.C.C.A.N. 6604, 6610), *cert. denied*, 506 U.S. 956 (1992); *see* 28 U.S.C. § 1602 ("Claims of foreign states to immunity should henceforth be decided by courts of the United States and of the States in conformity with the principles set forth in this chapter.").

The FSIA gives federal courts jurisdiction over civil actions against "a foreign state ... as to any claim for relief in personam with respect to which the foreign state is *not* entitled to immunity under [28 U.S.C. §§] 1605-1607 ... or under any applicable international agreement". 28 U.S.C. § 1330(a) (emphasis added). "Personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have [subject matter] jurisdiction under [§ 1330](a) where service has been made under [28 U.S.C. §] 1608". 28 U.S.C. § 1330(b). Accordingly,

6

"personal jurisdiction, like subject-matter jurisdiction, exists only when one of the exceptions to foreign sovereign immunity in §§ 1605-07 applies". *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 n.3 (1989). *See also* *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 485 n.5 (1983) ("Under the [FSIA], ... both statutory subject-matter jurisdiction ... and personal jurisdiction turn on application of the substantive provisions of the [FSIA].").

"[A] foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in [28 U.S.C. §§] 1605 to 1607". 28 U.S.C. § 1604. A "foreign state" includes "a political subdivision of a foreign state or an agency or instrumentality of a foreign state as defined in [§ 1603](b)". 28 U.S.C. § 1603(a). Such foreign state "agency or instrumentality" is:

> any entity —
>
> (1) which is a separate legal person, corporate or otherwise, and
>
> (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and
>
> (3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (d) of this title, nor created under the laws of any third country.

28 U.S.C. § 1603(b).

7

It is undisputed that Al Furat satisfies § 1603(b)'s first and third requirements for agency or instrumentality status. The district court held Al Furat satisfied both prongs of the second requirement, as well, holding it is an organ of a foreign state and a foreign state owns a majority of Al Furat's shares or other ownership interest. Appellants challenge the rulings as to both prongs.

Concerning § 1603(b)(2)'s "ownership" prong, the Syrian government owns Syrian Petroleum Company (*not* a party), which owns 50% of Al Furat. Therefore, at issue for that prong is the requisite majority status. But, because we conclude that Al Furat is an organ of a foreign state, we need *not* consider § 1603(b)(2)'s ownership requirements.

1.

Appellants claim Al Furat presented insufficient evidence to establish organ status. Alternatively, they maintain the district court erred by ruling without allowing them discovery. Resolution of the discovery issue is best understood in the light of our analysis of the first issue, including the sufficiency of the evidence regarding Al Furat's organ status. *See* **Wyatt v. Kaplan**, 686 F.2d 276, 278 (5th Cir. 1982).

a.

Most cases have determined § 1603(b)(2) agency/instrumentality status using the "ownership", rather than the "organ", prong. *See*

8

*Supra Med. Corp. v. McGonigle*, 955 F. Supp. 374, 378-79 (E.D. Pa. 1997) (observing that only a few federal courts have examined the "organ" prong, with *no* clear test to determine whether an entity so qualifies). In *Corporacion Mexicana de Servicios Maritimos, S.A. de C.V. v. M/T Respect*, 89 F.3d 650, 655 (9th Cir. 1996), Pemex-Refining was held an organ of a foreign state, because it: was created by Mexican law; is entirely owned by the Mexican government; is controlled entirely by government appointees; employs only public servants; and is charged with the exclusive responsibility of refining and distributing Mexican government property.

Citing *Corporacion*, the *Supra* district court listed five factors for determining § 1603(b)(2) organ status:

> (1) whether the foreign state created the entity for a national purpose; (2) whether the foreign state actively supervises the entity; (3) whether the foreign state requires the hiring of public employees and pays their salaries; (4) whether the entity holds exclusive rights to some right in the [foreign] country; and (5) how the entity is treated under foreign state law.

955 F. Supp. at 379.

Recently, Nippon Hoso Kyokai (NHK), the public television broadcasting corporation of Japan, was held an organ of Japan. *Alpha Therapeutic Corp. v. Nippon Hoso Kyokai*, 199 F.3d 1078, 1084-85 (9th Cir. 1999). NHK was created by the Japanese broadcast law, which required it to broadcast for the public welfare; its

9

programming had to satisfy government-mandated goals; its board members were appointed by the Japanese Prime Minister, with the consent of the Japanese parliament; a government minister supervised the board and reviewed the budget, which had to be approved by the parliament; its funding is derived from a government-mandated fee collected from all Japanese television owners; any amendment to its articles of incorporation that governed its operation must be adopted and approved by the government minister; it cannot earn profits and carries no commercial advertisements; and it is the only broadcaster designated by the Prime Minister as a "designated public institution". *Id*. at 1084. In rejecting plaintiffs' contention that NHK is *not* an organ of Japan because it has autonomy and independence from the Japanese government, the Ninth Circuit noted that "Japan has considerable control over the content of NHK's programming, budget, and operations". *Id*. at 1085.

In holding Al Furat is an organ of Syria, the district court applied the **Supra** factors, and they are utilized by both sides here. Accordingly, we shall apply them.

This notwithstanding, we agree with the **Alpha** and **Supra** courts that there is no "clear test" for determining agency or instrumentality status under the § 1603(b)(2) "organ" prong. *See* **Alpha**, 199 F.3d at 1084; **Supra**, 955 F. Supp. at 378-79. Therefore, although the **Supra** factors provide a helpful framework, we will *not*

10

apply them mechanically or require that all five support an organ-determination.

Our analysis must also take into account the nature of FSIA immunity, which is immunity not only from liability, but from the burdens of litigation as well. *See, e.g.*, **United States v. Moats**, 961 F.2d 1198, 1203 (5th Cir. 1992) ("sovereign immunity is an immunity from the burdens of becoming involved in any part of the litigation process, from pretrial wrangling to trial itself"). And, our analysis must also be guided by the well-established principle that, although a party claiming FSIA immunity retains the ultimate burden of persuasion on immunity, it need only present a prima facie case that it is a foreign state; and, if it does, the burden shifts to the party opposing immunity to present evidence that one of the exceptions to immunity applies. *E.g.*, **Byrd v. Corporacion Forestal y Industrial de Olancho S.A.**, 182 F.3d 380, 388 (5th Cir. 1999); **Walter Fuller Aircraft Sales**, 965 F.2d at 1383; **Arriba**, 962 F.2d at 533.

To support dismissal, Al Furat submitted declarations of its operations manager, Olsen, and the chief executive officer of Syrian Petroleum Company, Dr. Mualla. The latter declaration states: Syrian Petroleum Company was established according to Syrian law; its principal place of business is in Syria; and it is owned entirely by the Syrian government.

11

Olsen's declaration states: he is familiar with Al Furat's corporate records and activities; it is a citizen of Syria and has its principal place of business there; it is a private, non-profit-making, non-asset owning agent company incorporated under Syrian law; it is owned 50% by Syrian Petroleum Company, 31.25% by Syria Shell, and 18.75% by Deminex Syria GmbH; it was formed pursuant to a government authorization decree stating that Al Furat's objective is to develop identified petroleum reserves in Development Lease Areas in Syria; its by-laws require that, for its eight-member board, four be appointed by Syrian Petroleum Company, with one always serving as chairman; and, in view of Syria's declared policy, supported by Syrian law, that all minerals under the surface remain the property of Syria and will be explored and developed in a way to best serve the interests of Syria, Syrian Petroleum Company's representatives on the board have invariably been Syrian government officials representing the highest level of government.

Relying on those declarations, the district court concluded Al Furat had made a prima facie showing of immunity under the § 1603(b)(2) organ prong. It reasoned: Al Furat was created for a national purpose, because it was formed by government decree to develop and explore Syria's mineral resources, control over which is a basic aspect of sovereignty; and it had the exclusive right to develop those resources. The court noted also that, in ***Ebrahim v.***

12

***Shell Oil Co.***, 847 F. Supp. 65, 67 (S.D. Tex. 1994), Al Furat had been determined to be a Syrian agency or instrumentality. *See* ***Atwood Turnkey Drilling, Inc. v. Petroleo Brasileiro, S.A.***, 875 F.2d 1174, 1176 (5th Cir. 1989) (citing district court cases recognizing Petrobas' foreign sovereign status to support conclusion it was foreign sovereign), *cert. denied*, 493 U.S. 1075 (1990).

Asserting that the evidence presented by Al Furat pertains to only the first (foreign state-created entity for national purpose) and fourth (entity holds exclusive rights to some right in foreign country) ***Supra*** factors, Appellants contend the district court erred by concluding Al Furat is an organ of Syria in the absence of any evidence as to the remaining factors (whether Syria requires Al Furat to hire public employees and pays their salaries; whether Syria actively supervises it; and its treatment under Syrian law). And, they contend the evidence pertaining to the fourth ***Supra*** factor does *not* support the district court's conclusion that Al Furat has the exclusive right to develop Syria's mineral resources. They contend further that the district court erred by relying solely on Olsen's declaration regarding the provisions of Syrian law and Al Furat's by-laws, claiming his declaration raises more questions than it answers with respect to: governmental supervision and control over Al Furat; whether Olsen has expertise qualifying him to testify regarding Syrian law and policy; and the

13

identity of Syrian government officials who have served on Al Furat's board.  In sum, Appellants maintain that the conclusion is *not* supported by sufficient evidence, because Al Furat addressed only two of the five **Supra** factors, and the documents referenced in Olsen's declaration were *not* provided to the court.

The evidence is sufficient to support the district court's conclusion that Al Furat made a prima facie showing it is an organ of Syria.  With respect to the first **Supra** factor, Olsen's declaration establishes that Al Furat was created by a Syrian government decree for a national purpose:  the development and exploration of Syria's mineral resources, pursuant to Syria's policy that all minerals under the surface remain the property of Syria and will be explored and developed in a manner that will best serve the interests of Syria.  Contrary to Appellants' assertion, the evidence that Syrian Petroleum Company appoints four of the eight Al Furat board members, including the chairman, and that such appointees have invariably been high-level Syrian government officials, supports a determination of organ status under the second and third **Supra** factors.  And, also contrary to Appellants' contention, the evidence supports the district court's conclusion, with respect to the fourth **Supra** factor, that Al Furat has the exclusive right to explore and develop Syria's identified petroleum reserves, which are the property of the Syrian government.

14

And, in addition to the Olsen and Dr. Mualla declarations establishing that Al Furat was created for the purpose of developing identified petroleum reserves in Development Lease Areas in Syria, Al Furat also supported its dismissal motion with a copy of the legislative decree creating Syrian Petroleum Company (again, wholly owned by the Syrian government, owns 50% of Al Furat, and appoints half of its board, including the chairman). The decree provides that Syrian Petroleum Company "shall handle all the works that aim[] to discover[] oil wealth[] in the country and to exploit and develop such wealth".

There is *no* evidence as to how Al Furat is treated under Syrian law (the fifth **Supra** factor). But, this does *not* undermine our conclusion that, on balance, Al Furat presented sufficient evidence to establish a prima facie case for organ status.

b.

Alternatively, in maintaining they were *not* allowed necessary discovery regarding the extent of Syria's control over Al Furat, Appellants claim the district court abused its discretion by *not* allowing them to depose Olsen and review the documents and laws referenced in his declaration.

Again, FSIA immunity is immunity not only from liability, but also from the costs, in time and expense, and other disruptions attendant to litigation. *See* **Moats**, 961 F.2d at 1203 ("sovereign immunity is an immunity from the burdens of becoming involved in

15

any part of the litigation process, from pretrial wrangling to trial itself"); *In re Papandreou*, 139 F.3d 247, 251 (D.C. Cir. 1998) ("[s]overeign immunity is an immunity from trial and the attendant burdens of litigation, and not just a defense to liability on the merits" (internal quotation marks and citation omitted)).

Accordingly, when FSIA immunity has been claimed, unlimited jurisdictional discovery is *not* permitted as a matter of course. Instead, it "should be ordered circumspectly and only to verify allegations of specific facts crucial to an immunity determination". *Arriba*, 962 F.2d at 534; *see also* *First City, Texas-Houston, N.A. v. Rafidain Bank*, 150 F.3d 172, 176 (2d Cir. 1998) (comity concerns implicated by allowing jurisdictional discovery from foreign sovereign "require a delicate balancing between permitting discovery to substantiate exceptions to statutory foreign sovereign immunity and protecting a sovereign's or sovereign agency's legitimate claim to immunity from discovery"); *Papandreou*, 139 F.3d at 253 ("discovery [authorized] to determine whether immunity bars jurisdiction must proceed with circumspection, lest the evaluation of the immunity itself encroach unduly on the benefits the immunity was to ensure").

The district court "is given the authority to resolve factual disputes, along with the discretion to devise a method for making a determination with regard to the jurisdictional issue". *Moran*,

27 F.3d at 172. The procedure it adopts "may include considering affidavits, allowing ... discovery, hearing oral testimony, conducting an evidentiary hearing". *Id*. As stated, "discovery ... should be limited to only that which is necessary to determine the preliminary jurisdictional issue". *Id*. "A necessary prerequisite to an order for limited discovery is a district court's clear understanding of the plaintiff's claims against a sovereign entity." *Arriba*, 962 F.2d at 534.

In denying discovery, the district court relied on our court's opinion in *Arriba*. Appellants assert that *Arriba*, which addressed discovery regarding whether an exception to immunity applied, is inapplicable, because they instead sought discovery to ascertain whether Al Furat *was* a sovereign. They contend it was circuitous for the district court to deny is-Al Furat-a-sovereign-discovery on the ground that its status as a sovereign protected it from such discovery. Appellants maintain that deposing Olsen regarding Syria's supervision and control of Al Furat, and reviewing the documents referenced in his declaration, were crucial for determining whether Al Furat is an organ of Syria.

Our review of the record reveals *no* abuse of discretion in denying the discovery. As discussed *infra*, although Appellants were *not* prohibited from seeking discovery for over three months, they did *not* make any formal requests to conduct it on the immunity

17

issue until after being informed by the magistrate judge that a recommendation on dismissal was imminent.

Both actions (Kelly/Carpenter and Strong) were removed on 10 July 1997. Al Furat's dismissal motions were filed approximately two weeks later, on 25 July.

On 8 August, Appellant Strong moved to conduct discovery prior to the FED. R. CIV. P. 26(f) conference, maintaining she could *not* adequately respond to Al Furat's motion until after deposing Olsen and Dr. Mualla. *See* FED. R. CIV. P. 26(d) ("Except when authorized under these rules or by local rule, order, or agreement of the parties, a party may *not* seek discovery from any source before the parties have met and conferred as required by subdivision (f)." (emphasis added)). And, in their 14 August opposition to Al Furat's motions, Appellants requested that ruling on dismissal be deferred pending completion of discovery regarding the factual allegations in the declarations supporting dismissal, including deposing Olsen and Dr. Mualla.

In its 4 September reply to the Kelly and Carpenter Appellants' opposition to dismissal, Al Furat asserted that, because sovereign immunity is immunity from the attendant burdens of suit as well as from liability, and because Appellants had made *no* showing of what they hoped to obtain by discovery, the court should *not* permit a "fishing expedition". And, on 8 September, Al

Furat moved in the Strong action to stay discovery pending ruling on dismissal.

The two actions were consolidated on 8 October. Al Furat, on 17 October, filed a supplemental motion to stay discovery and to defer Rule 26 matters, pending ruling on dismissal.

None of the motions were ruled on prior to the 7 November Rule 26(f) conference. On 11 November, the parties submitted their Rule 26(f) joint discovery/case management plan, with Appellants stating they were ready to begin discovery immediately, and Al Furat opposing discovery pending ruling on dismissal.

At oral argument here, Appellants conceded they had *not* been prohibited from conducting discovery between the 7 November 1997 Rule 26(f) conference and 24 February 1998, when the magistrate judge made her discovery recommendation. Although by motion and supplemental response to Al Furat's dismissal motion, both filed in early December, Appellants stated their desire to conduct discovery, they did *not* formally request it until 19 January 1998 (over two months after the Rule 26(f) conference), when they noticed the deposition of Wright of WB&C.

Appellees moved for a protective order to preclude Wright's deposition, asserting discovery should be stayed pending ruling on dismissal. The magistrate judge, at a telephonic hearing on 22 January, allowed Wright's deposition on personal jurisdiction only, because Appellants had *not* shown immunity discovery should be

19

allowed. During that conference, the magistrate judge advised she was ready to make a recommendation on dismissal.

At Wright's deposition the next day, 23 January, Appellants stated on the record they wanted to depose Warmenhoven, Olsen, and Anderson (the latter was believed to be associated with Al Furat) on jurisdictional matters; Al Furat would *not* agree. On 27 January, despite there being *no* outstanding discovery requests, Appellants moved to compel discovery and to delay ruling on dismissal. The documents at issue in the motion to compel had been requested at Wright's 23 January deposition, but he had refused to produce them because of a confidentiality agreement with Al Furat. Appellants eventually received them.

Al Furat's immediate response was that, in the light of the magistrate judge's statement that a recommendation on dismissal was imminent, it was hardly surprising it refused the verbal request to produce for depositions three persons who lived overseas. Al Furat asserted further that the court should require Appellants to give a better reason to depose overseas witnesses than disbelief in their sworn declarations. (Anderson did *not* file a declaration.)

At a 29 January hearing on the motion to compel, the magistrate judge expressed frustration at Appellants' failure, despite repeated requests, to demonstrate a need for discovery by articulating specific facts crucial to the immunity issue. The magistrate judge stated further that Appellants had *not* taken any

steps to conduct discovery other than deposing Wright, which she had allowed, albeit only as to personal jurisdiction. The magistrate judge, "in utmost generosity and abundance of caution", stated she would allow Appellants, on or before 9 February, to file supplemental responses to Al Furat's motion to stay discovery, giving them yet another opportunity to make the requisite showing to obtain discovery from Al Furat on immunity.

In their 9 February memorandum in support of allowing discovery and delaying ruling on dismissal, Appellants asserted: they were entitled to all documentation regarding Al Furat's creation; they should be allowed discovery on other indicia of ownership interest by Al Furat's owners, and on issues of actual control, financial arrangements between the parties, and distribution of profits and proceeds, including production of crude oil and gas; because their claims are based on duties created by Al Furat's contracts with WB&C and B&C, they were entitled to discovery regarding those contracts, the rights and responsibilities of the parties under them, and the effect of the contracts on Al Furat's activities in the United States; and they should be allowed to depose Olsen to determine the background and sources of the information in his declaration. They asserted also: the court should *not* be entirely dependent on Olsen's interpretation of Syrian law, because there was *no* showing he was qualified to make the legal conclusions in his declaration or had

21

any authority to speak for the Syrian government; they expected discovery to show Al Furat has many current or former Shell employees or contractors playing significant roles; and there were questions concerning whether "Shell" controlled Al Furat.

According to Appellees (and *not* disputed by Appellants), Appellants propounded their *first* written discovery on 17 February 1998. One week later, on 24 February, the magistrate judge recommended staying discovery. Two days later, the magistrate judge recommended dismissal. Both recommendations were adopted on 31 March.

Appellants attempt to excuse their lack of discovery diligence on the ground that, because Al Furat had steadfastly expressed its opposition, it was readily apparent that specific discovery requests would only lead to additional opposition and, because such motions were already pending, it would have been an unnecessary waste of effort to serve specific discovery requests or notice depositions. Such alleged futility does *not* excuse *not* making specific discovery requests, and obtaining a ruling in the event of objection by Al Furat. Although free to do so after 7 November, Appellants did *not* make any specific, formal discovery requests on immunity until *after* the magistrate judge had advised a recommendation regarding dismissal was imminent.

Moreover, despite repeated attempts by the magistrate judge to obtain from Appellants the requisite showing of a need for immunity

discovery from Al Furat, Appellants essentially claimed *only* entitlement to cross-examine Olsen and to examine the documents and laws referenced in his declaration to determine whether he had told the truth. In her recommendation on the discovery issues, the magistrate judge noted Appellants had been given several opportunities to make the requisite showing for justifying immunity discovery, but had *not* alleged specific facts which, if true, would show Al Furat was *not* entitled to immunity, or that any exception to immunity applied. The magistrate judge stated further that Appellants had offered *no* reason to question that Olsen was credible or that, as Al Furat's operations manager, he was qualified to testify about Al Furat's structure; and that they had *not* provided legal support for blanket disregard of his sworn statements in the absence of such question.

Considering Appellants' failure to diligently seek discovery and their concomitant failure to allege specific facts crucial to immunity which demonstrated a need for discovery, the district court did *not* abuse its discretion by *not* allowing Appellants to conduct such discovery prior to ruling on dismissal.

2.

Notwithstanding Al Furat being an organ of Syria, Appellants contend the district court erred by refusing to apply the 28 U.S.C. § 1605(a)(2) commercial activity exception to immunity. A foreign state is *not* immune from suit in United States courts when

> the action is *based upon* a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2) (emphasis added). "Commercial activity" is

> either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose.

28 U.S.C. § 1603(d).

Appellants rely on the first clause of § 1605(a)(2): "commercial activity carried on in the United States by the foreign state", defined by the FSIA as "commercial activity carried on by such state and having substantial contact with the United States". 28 U.S.C. § 1603(e). They claim Al Furat carried on commercial activity in the United States by entering into contracts with WB&C and B&C, which required performance in both Syria and the United States. Appellants maintain: the B&C work order required Al Furat to pay B&C invoices in Texas (although, as noted, there is *no* evidence it did so); in the WB&C contract, Al Furat appointed WB&C as its agent for procuring equipment, materials, and services in the United States; and, as a result of that agency relationship, Al Furat, through its agent WB&C, purchased goods and services from

24

various contractors in the United States, including B&C, which employed Appellants' decedents. Appellants assert their claims are based on Al Furat's breach of its contractually imposed duties to monitor the work and set safety standards; therefore, the claims are based upon Al Furat's commercial activity in the United States.

The district court rejected the commercial activity exception because the contracts were executed in Syria; decedents were *not* third party beneficiaries to the contracts; and Appellants' claims are *not* based upon those contracts. As discussed *infra*, the commercial activity exception does *not* apply, because Appellants' claims are *not* based upon Al Furat's assumed commercial activity in the United States. (Therefore, we do *not* address Appellants' contentions regarding the first two bases for the ruling on the exception.)

We assume *arguendo* that Al Furat engaged in commercial activity in the United States when it entered into contracts with WB&C and B&C for well control services. *See Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614 (1992) ("when a foreign government acts, not as regulator of a market, but in the manner of a private player within it, the foreign sovereign's actions are 'commercial' within the meaning of the FSIA"); *Walter Fuller Aircraft Sales*, 965 F.2d at 1384 ("courts typically hold that contracts for the procurement of goods and services are commercial rather than governmental in nature").

25

Nevertheless, as stated in § 1605(a)(2), the commercial activity exception applies *only* if Appellants' claims are "based upon" that activity. *See, e.g.*, **Voest-Alpine Trading USA Corp. v. Bank of China**, 142 F.3d 887, 892 (5th Cir.) ("the cause of action [must] be 'based upon' a certain act or activity of the foreign state, that is, the act or activity must form the basis of at least some element of the cause of action"), *cert. denied*, 525 U.S. 1041 (1998); **Walter Fuller Aircraft Sales**, 965 F.2d at 1384 ("suit must be based upon 'commercial activity' which has at least one of the three jurisdictional connections with the United States set forth in § 1605(a)(2)"); **Arriba**, 962 F.2d at 533 ("the commercial activity that provides the jurisdictional nexus with the United States must also be the activity on which the lawsuit is based" (internal quotation marks and citation omitted)); **Moats**, 961 F.2d at 1205 ("the applicability of the commercial activities exception depends on whether the particular conduct giving rise to the claim in question actually constitutes or is in connection with commercial activity, regardless of the defendant's generally commercial or governmental character").

In **Saudi Arabia v. Nelson**, 507 U.S. 349, 357 (1993), the Court stated that the § 1605(a)(2) "based upon" phrase "is read most naturally to mean those elements of a claim that, if proven, would entitle a plaintiff to relief under his theory of the case". In **Nelson**, plaintiff alleged he was recruited in the United States by

26

Saudi Arabia for employment there and, while in Saudi Arabia, was imprisoned and tortured by the Saudi government. *Id*. at 352-54. The Supreme Court rejected plaintiff's contention that the first clause of the commercial activity exception applied, explaining that, although Saudi Arabia's commercial activity in the United States (recruiting plaintiff for employment in Saudi Arabia) "led to the conduct that eventually injured" plaintiff, that commercial activity was "*not* the basis for" plaintiff's action, which claimed he suffered "personal injuries caused by [Saudi Arabia's] intentional wrongs and by [its] failure to warn". *Id*. at 358 (emphasis added). "Those torts, and *not* the arguably commercial activities that preceded their commission, form[ed] the basis for [plaintiff's] suit." *Id*. (emphasis added).

As noted, Appellants did amend their complaints to claim breach of contract. But, because they do *not* challenge the ruling they are *not* third-party beneficiaries of the WB&C contract or the B&C work order, they have apparently abandoned their claim they have standing to sue for breach of contract. Instead, their focus on appeal seems to be that the WB&C contract establishes the requisite duty element for their negligence claims.

They maintain proof of the duty element is established by Al Furat's contract with WB&C, which imposed on Al Furat duties to monitor the work and set safety standards applicable to contractors at the well site. Appellants thus contend the Al Furat/WB&C

27

contract is an essential element of their negligence claims against Al Furat, and assert their claims are based on that contract, on the ground that Al Furat's claimed breach of those contractually-imposed duties proximately caused the deaths.

Obviously, one of the essential elements of the negligence claims is the existence of a duty imposed on Al Furat. But, simply because the WB&C contract imposes duties on Al Furat, the breach of which allegedly caused the deaths, does *not* make that contract an essential element of the claims. Because Appellants are neither parties to, nor third-party beneficiaries of, that contract, any duty owed by Al Furat to decedents arose by operation of law, independent of the existence of that contract. As in **Nelson**, the alleged "torts, and *not* the arguably commercial activities that preceded their commission, form the basis for [Appellants'] suit". 507 U.S. at 358 (emphasis added).

Accordingly, the district court correctly concluded that the commercial activity exception does *not* apply.

B.

We review *de novo* the lack of personal jurisdiction dismissal of Syria Shell, Royal Dutch, and Shell Transport (collectively, Shell Appellees). **Alpine View Co. Ltd. v. Atlas Copco AB**, 205 F.3d 208, 214 (5th Cir. 2000). Although Appellants bear the burden of proof, it is *not* necessary for them to "establish personal jurisdiction by a preponderance of the evidence; *prima facie*

28

evidence of personal jurisdiction is sufficient". **Wyatt**, 686 F.2d at 280. We accept their "uncontroverted allegations, and resolve in [their] favor all conflicts between the facts contained in the parties' affidavits and other documentation". **Alpine**, 205 F.3d at 215.

The Texas long-arm statute, TEX. CIV. PRAC. & REM. CODE ANN. § 17.042, authorizes personal jurisdiction over a nonresident defendant to the fullest extent allowed by the United States Constitution. *See* **Wilson v. Belin**, 20 F.3d 644, 647 & n.1 (5th Cir.), *cert. denied*, 513 U.S. 930 (1994). Accordingly, we need only determine whether exercising jurisdiction over Shell Appellees is consistent with the Due Process Clause. *See* **Alpine**, 205 F.3d at 214.

Due process standards for personal jurisdiction are well-established.

> The Due Process Clause ... permits the exercise of personal jurisdiction over a nonresident defendant when (1) that defendant has purposefully availed [itself] of the benefits and protections of the forum state by establishing *minimum contacts* with the forum state; and (2) the exercise of jurisdiction over that defendant does not offend traditional notions of fair play and substantial justice.

*Id*. at 214-15 (internal quotation marks and citation omitted; emphasis added).*

---

*For the first prong of this two-part test, as discussed *infra,* Appellants have *not* made a prima facie showing that Shell

29

The "minimum contacts" requirement can be established through contacts sufficient to assert either specific or general jurisdiction. *Id*. at 215.

> *Specific jurisdiction* over a nonresident corporation is appropriate when that corporation has purposefully directed its activities at the forum state and the litigation results from alleged injuries that *arise out of or relate to those activities*. *General jurisdiction*, on the other hand, will attach where the nonresident defendant's contacts with the forum state, although *not* related to the plaintiffs' cause of action, are *continuous and systematic*.

*Id*. (emphasis added) (internal quotation marks and citation omitted). Appellants claim Syria Shell's contacts with Texas support specific jurisdiction, while the contacts by it and the other two Shell Appellees support general jurisdiction.

1.

We first address specific jurisdiction *vel non* for Syria Shell, which owns almost a third of Al Furat.

a.

Appellants implicitly concede Syria Shell had *no* direct contacts with Texas. Nevertheless, they base specific jurisdiction on their claims allegedly arising out of the contract between Al Furat and WB&C, which provided that, in entering into that

---

Appellees have the requisite minimum contacts with Texas. Therefore, we need *not* consider the second prong — whether exercising personal jurisdiction would offend "traditional notions of fair play and substantial justice".

30

contract, Al Furat was acting as an agent for Syria Shell, and which appointed WB&C as agent for Al Furat and Syria Shell for obtaining goods and services from Texas for use in controlling the well. Appellants assert that, by entering into a contract with a Texas company for services to be performed in Texas, Syria Shell, through its claimed agent, Al Furat, established the requisite minimum contacts with Texas. (Appellants also rely on evidence that Warmenhoven, an employee of a "Shell" entity, initially contacted WB&C to secure the services of Appellants' decedents in Syria; and that Beasely, a "Shell" employee, negotiated the contract between Al Furat and WB&C. But, they do *not* explain how such evidence supports specific jurisdiction for Syria Shell.)

The language relied on in Al Furat's contract with WB&C does *not* provide that Al Furat is acting as agent for Syria Shell in executing that contract. Instead, it states that Al Furat was "an agent for [Syria Shell] in executing the service contract for the exploration of oil ratified by law number 43 1977". Obviously, this recitation does *not* make Al Furat an agent for Syria Shell for purposes of the WB&C contract.

But, even assuming Al Furat's contacts with Texas, in entering into and performing the contract with WB&C, are properly attributable to Syria Shell, specific jurisdiction does *not* exist for it, because Appellants' claims do *not* arise out of those

31

contacts. Instead, they arise out of alleged tortious acts committed by Al Furat in Syria.

Accordingly, the district court correctly concluded there was *no* specific jurisdiction for Syria Shell.

b.

Alternatively, Appellants contend they should have been allowed more jurisdictional discovery prior to Syria Shell's dismissal. A district court has "broad discretion in all discovery matters", and "such discretion will not be disturbed ordinarily unless there are unusual circumstances showing a clear abuse." *Wyatt*, 686 F.2d at 283 (internal quotation marks and citation omitted).

A district court is *not* required to defer ruling on a jurisdictional motion until all discovery contemplated by the plaintiff has been accomplished; instead, an *opportunity* for discovery is required. *See Patterson v. Dietze, Inc.*, 764 F.2d 1145, 1147 n.4 (5th Cir. 1985). Our discussion of Appellants' lack of diligence regarding FSIA immunity discovery is relevant to our analysis of discovery issues relating to personal jurisdiction, because the discovery motions and responses generally dealt with both types of jurisdiction.

As discussed, Appellants did *not* take advantage of the ample opportunity to conduct discovery. Despite there being *no* formal prohibition on discovery after the 7 November 1997 Rule 26(f)

32

conference, Appellants made *no* specific discovery requests until they noticed Wright's deposition on 19 January. The magistrate judge allowed them to depose Wright regarding personal jurisdiction, and they obtained the requested documents regarding the communications between Al Furat and WB&C about their contract. After being informed by the magistrate judge that a recommendation on dismissal was imminent, Appellants did *not* notice any other depositions, and sent their first written discovery request only one week before the magistrate judge made her recommendation on discovery, and only nine days before she made her recommendation on dismissal.

Moreover, "[d]iscovery on matters of personal jurisdiction ... need not be permitted unless the motion to dismiss raises issues of fact". *Wyatt*, 686 F.2d at 284. "When the lack of personal jurisdiction is clear, discovery would serve no purpose and should not be permitted." *Id*. Appellants' brief does *not* describe the discovery they contend should have been allowed, what facts they hoped to obtain from such discovery, or how it would produce information that would support specific jurisdiction for Syria Shell. In any event, *no* amount of information on Syria Shell's contacts with Texas, through its claimed agent, Al Furat, would strengthen Appellants' assertion of specific jurisdiction for Syria Shell, because, as stated, their claims did *not* arise from such contacts.

33

Accordingly, the district court did *not* abuse its discretion by *not* allowing additional jurisdictional discovery prior to ruling there was *no* specific jurisdiction for Syria Shell. *See **id**.* ("this Court affirms denials of discovery on questions of personal jurisdiction in cases where discovery sought could not have added any significant facts" (internal quotation marks and citation omitted)).

2.

Appellants claim general jurisdiction for Syria Shell and the other two Shell Appellees (Royal Dutch and Shell Transport).

a.

Appellants maintain the ongoing relationship between WB&C and Syria Shell, through its claimed agent, Al Furat, is sufficient to constitute continuous and systematic contacts for general jurisdiction for Syria Shell. They assert that, if the district court had allowed discovery on the nature and extent of that relationship, they could have developed evidence of such contacts' systematic and continuous nature.

Even assuming Al Furat's contacts with Texas, through its contractual relationships with WB&C and B&C, are attributable to Syria Shell, they were *not* continuous and systematic and thus do *not* confer general jurisdiction for Syria Shell. *See **Helicopteros Nacionales de Colombia, S.A. v. Hall***, 466 U.S. 408, 415-19 (1984).

34

With respect to their inadequate-discovery contention, Appellants have *not* described the discovery they contend should have been allowed, or how it could produce evidence establishing the propriety of general jurisdiction for Syria Shell. Moreover, as discussed, Appellants did *not* exercise diligence in discovery.

b.

The other two Shell Appellees, Royal Dutch and Shell Transport, had *no* direct contacts with Texas. General jurisdiction is claimed because of their ownership of Shell Petroleum Inc., which owns Shell Oil Company, which has its principal place of business in Texas. Appellants do so by attributing Shell Oil Company's contacts with Texas to Royal Dutch and Shell Transport. Concomitantly, they claim the district court erred by dismissing Royal Dutch and Shell Transport without allowing depositions of those Appellees regarding their relationship with, and control over, Shell Oil Company, as well as to determine whether they maintained other contacts with Texas.

(1)

To attribute Shell Oil Company's contacts with Texas to Royal Dutch and Shell Transport, which own Shell Petroleum Inc., Appellants would have to establish: (1) Royal Dutch and Shell Transport are the alter egos of Shell Petroleum, which owns Shell Oil Company; and (2) Shell Petroleum is the alter ego of Shell Oil Company. There is *no* evidence to support either conclusion.

35

The prerequisites for establishing personal jurisdiction over a corporation, based on the contacts of its subsidiary, are described in *Hargrave v. Fibreboard Corp.*, 710 F.2d 1154 (5th Cir. 1983).

> [S]o long as a parent and subsidiary maintain separate and distinct corporate entities, the presence of one in a forum state may not be attributed to the other.... Generally, our cases demand proof of control by the parent over the internal business operations and affairs of the subsidiary in order to fuse the two for jurisdictional purposes.... The degree of control exercised by the parent must be greater than that normally associated with common ownership and directorship.... All the relevant facts and circumstances surrounding the operations of the parent and subsidiary must be examined to determine whether two separate and distinct corporate entities exist.

*Id*. at 1160 (internal quotation marks and citations omitted). *See also Access Telecom, Inc. v. MCI Telecommunications Corp.*, 197 F.3d 694, 717 (5th Cir. 1999) ("typically, the corporate independence of companies defeats the assertion of jurisdiction over one by using contacts with the other"); *Dickson Marine, Inc. v. Panalpina, Inc.*, 179 F.3d 331, 338 (5th Cir. 1999) ("Courts have long presumed the institutional independence of related corporations, such as parent and subsidiary, when determining if one corporation's contacts with a forum can be the basis of a related corporation's contacts"; presumption may be overcome by "clear evidence"); *Southmark Corp. v. Life Investors, Inc.*, 851 F.2d 763, 773-74 (5th Cir. 1988) ("it is well-settled that where ... a wholly owned subsidiary is

36

operated as a distinct corporation, its contacts with the forum cannot be imputed to the parent").

In support of dismissal, Shell Appellees submitted the declarations of van der Vlist, the General Attorney of Royal Dutch; Munsiff, the Secretary of Shell Transport; and Paul, the Assistant Secretary of Shell Oil Company. Those declarations establish: Royal Dutch and Shell Transport are holding companies, which own investments in various entities known collectively as the Royal Dutch/Shell group of companies; Shell Oil Company is a wholly-owned subsidiary of Shell Petroleum Inc.; Royal Dutch and Shell Transport have indirect investments in Shell Oil Company, by virtue of their ownership of Shell Petroleum Inc.; Shell Oil Company is *not* a division of Royal Dutch or Shell Transport; Shell Oil Company has its own capital and its own employee benefit programs; Shell Oil Company's board consists of 11 members, one being an officer of Royal Dutch and one a director of Shell Transport; and Shell Oil Company's officers are *not* officers of Royal Dutch or Shell Transport.

Appellants have *not* made a prima facie showing that Shell Transport and Royal Dutch so control the activities of Shell Petroleum Inc., and that, in turn, it so controls the activities of Shell Oil Company, that the latter's contacts with Texas may be attributed to Shell Transport and Royal Dutch for purposes of general jurisdiction. Appellants presented *no* evidence that:

37

Royal Dutch and Shell Transport financed the operations of Shell Oil Company; Royal Dutch and Shell Transport caused the incorporation of Shell Oil Company; Shell Oil Company is grossly undercapitalized; Royal Dutch and Shell Transport paid the salaries and other expenses of Shell Oil Company; Shell Oil Company received all its business from Royal Dutch and Shell Transport; Royal Dutch and Shell Transport used Shell Oil Company's property as their own; daily operations of the corporations were *not* separate; or Shell Oil Company does *not* observe corporate formalities. *See **Gundle Lining Const. Corp. v. Adams County Asphalt, Inc.**,* 85 F.3d 201, 208-09 (5th Cir. 1996) (listing factors considered in determining whether subsidiary is alter ego of parent corporation); *see also **Gardemal v. Westin Hotel Co.**,* 186 F.3d 588, 593 (5th Cir. 1999) (under Texas law, alter ego doctrine "applies when there is such unity between the parent corporation and its subsidiary that the separateness of the two corporations has ceased and holding only the subsidiary corporation liable would result in injustice" (internal quotation marks and citation omitted)).

Accordingly, the district court correctly held that there was *no* general jurisdiction for Royal Dutch and Shell Transport based on Shell Oil Company's contacts with Texas.

(2)

Appellants offer nothing to support their conclusory assertion they could have established evidence to support their alter ego

38

theory had discovery *not* been restricted.  The declarations of the Royal Dutch, Shell Transport, and Shell Oil Company corporate representatives negate the possibility that, by virtue of their ownership of Shell Petroleum Inc., Royal Dutch and Shell Transport are the alter egos of Shell Oil Company.  Appellants offer *no* basis whatsoever to support an inference that those corporate representatives' deposition testimony would contradict their sworn declarations.  And, once again, Appellants did *not* act diligently in discovery.

Accordingly, the district court did *not* abuse its discretion by dismissing Royal Dutch and Shell Transport without allowing additional jurisdictional discovery.

III.

For the foregoing reasons, the judgment is

*AFFIRMED.*