**RELIANT ENERGY SERVICES, INC. Plaintiff,**

v.

**ENRON CANADA CORP. Defendant.**

**No. CIV.A.H–02–0706.**

United States District Court, S.D. Texas, Houston Division.

March 22, 2003.

Richard E. Griffin, Jackson Walker, Houston, TX, for Reliant Energy Services Inc.

John B. Strasburger, Weil, Gotshal and Manges, Houston, TX, for Enron Canada Corp.

## MEMORANDUM AND ORDER

HARMON, District Judge.

Pending before the Court is Defendant Enron Canada Corp.'s motion to dismiss. (Instrument No. 7). After reviewing the record and the applicable law, the Court concludes that the motion should be **GRANTED.**

## I. Background.

Reliant Energy Services, Inc. and Reliant Energy Services Canada, Ltd. (collectively referred to as "Reliant") have a long history of transactions with five subsidiaries of Enron Corporation: Enron North America Corp.; Enron Broadband Services, L.P.; ENA Upstream Company, LLC; Enron Power Marketing, Inc.; and, the defendant the present action, Enron Canada Corporation ("Enron Canada").

The transactions between Reliant and the Enron entities took the form of trading agreements, forwarding contracts, and swapping agreements in which the parties purchased and sold natural gas, electricity, broadband and other energy commodities. These agreements, called master agreements, facilitated the exchange of commodities between the Enron subsidiaries and Reliant. The master agreements outlined the terms of a course of dealings between the parties regarding a specific commodity. One such master agreement was the Master Power Purchase and Sale Agreement dated September 22, 2000 between Reliant and Enron Power Marketing, Inc. The Master Power Agreement eliminated the need to enter into a contract for each sale or purchase of power units. Rather, the agreement outlined the terms of all future purchases and sales of power, thereby reducing transaction costs and facilitating exchange.

Reliant and various Enron subsidiaries performed under the master agreements without incident for a number of years. However, in October of 2001 questions began to arise regarding Enron Corporation's accounting practices and financial statements.

During October the five Enron subsidiaries approached Reliant with a proposal that all the parties enter into a broad agreement, called a Master Netting, Set-off, and Security Agreement ("Netting Agreement"). The effect of the Netting Agreement was to combine the various underlying master agreements into one integrated agreement between the five Enron subsidiaries and Reliant. The Netting Agreement provided that if one of the parties to an underlying master agreement defaulted on its obligations, the non-defaulting party could declare all of the underlying master agreements in default. After giving all the parties notice of the

default to the other parties, under the Netting Agreement, the non-defaulting party had the right to take the following actions:

  (i) accelerate, terminate, and liquidate, or otherwise close-out all Transactions under its Underlying Master Agreements as of such designated date;

  (ii) exercise rights of setoff, netting, and/or recoupment in accordance with the terms of its Underlying Master Agreements;

  (iii) retain any Collateral;

  (iv) with respect to each Defaulting Party to pay, secure, setoff against, net, and/or recoup such Defaulting Party's Obligations to such Non-defaulting Party;

  (v) convert any Obligation from one currency into another currency as set forth in Section 5; and

  (vi) take any other action permitted by law or in equity or by its Underlying Master Agreements or any Transactions thereunder necessary or appropriate to protect, preserve, or enforce its rights or to reduce any risk of loss or delay

(Master Netting Agreement, § 2(b), p. 5).

On November 8, 2001, the five Enron parties and Reliant executed the Netting Agreement. That same day Enron Corporation announced that it was restating its earnings as far back as 1997 to account for losses related to a number of complex partnerships resulting in a $586 million reduction in net income, an additional $2.5 billion in debt, and 77–cent reduction in earnings per share.

Enron's announcement accelerated the decline in its stock price. On November 28, 2001 several credit rating agencies downgraded Enron to "junk" status. Consequently, Reliant sent a letter to the Enron parties to the Netting Agreement, requesting collateral in the amount of $88,750,000. However, no response was forthcoming. Reliant sent further requests on November 29 and 30, also to no avail.

Finally, on November 30, Reliant issued notice to the Enron parties, pursuant to the Master Netting Agreement, that Enron Power Marketing, Inc. was in default on the Master Power Purchase and Sale Agreement and, therefore, that all the Enron parties were in default on the Master Netting Agreement.

On December 2, 2001, four of the five Enron parties to the Netting Agreement filed for chapter 11 bankruptcy protection. Despite the automatic stay, on February 19, 2002, Reliant informed the Enron parties of the amount due under the master agreements. Reliant sent notice to Enron North America stating that a "final settlement amount" of $78,468,996.60 was due. However, no funds were forthcoming.

On February 26, 2002 Reliant filed the present action against Enron Canada, the only Enron party which had not filed for bankruptcy protection, seeking declaratory and injunctive relief. Reliant seeks a declaration by the Court that Enron Canada is, under the terms of the Master Netting Agreement, jointly liable for the $78,468,996.60 owed under the netting agreement. Reliant also asks the Court to enter an injunction requiring Enron Canada to pay the alleged settlement amount into the registry of the Court due to statements from Enron Canada that it intends to cease operations, liquidate its assets, and forward the proceeds to its parent company, Enron Corp.

Currently before the Court is Enron Canada's motion to dismiss. Enron Canada asserts that the Court lacks personal jurisdiction and, in the alternative, the bankruptcy stay requires the Court to dis-

miss Reliant's efforts to collect debts owed by the Enron parties currently in bankruptcy proceedings.

## II. Jurisdiction.

▮ Federal Rule of Civil Procedure 12(b)(2) provides for dismissal for "lack of jurisdiction over the person." Once called into question, the Plaintiff bears the burden of proof of establishing personal jurisdiction. *See Kelly v. Syria Shell Petroleum Development*, 213 F.3d 841, 854 (5th Cir.2000). However, Plaintiff need not establish personal jurisdiction by a preponderance of the evidence; prima facie evidence is sufficient. *See Id.*

▮ To prevent dismissal, plaintiff bears the burden of proving a prima facie case: "(1) that defendant has purposefully availed himself of the benefits and protections of the forum state by establishing minimum contacts with the forum state, and (2) the exercise of jurisdiction over that defendant does not offend traditional notions of fair play and substantial justice." *Panda Brandywine Corp. v. Potomac Electric Power Co.*, 253 F.3d 865, 867 (5th Cir.2001).

▮ In the present case, Reliant offered evidence of the following facts: Nearly 20% of Enron Canada's revenue of $117,210,325 flows from what it calls "Houston deals"; Enron Canada's filings with the Texas Secretary of State lists Houston addresses for its officers and directors; Enron Canada is an indirect wholly-owned subsidiary of Enron Corp, which is headquartered in Houston, Texas; Enron North America Corp is the sole shareholder of Enron Canada, which, in turn, is owned by Enron Corp.; Enron Canada's financial statements are consolidated with Enron Corp.; Enron Corp. provides Enron Canada's primary credit support; Through November 2001 Enron Canada's cash was directed into Enron Corp.'s cash management system; and Enron Canada's

trading business is run through Enron Corp.'s gas and power nomination and transaction system in Houston.

The evidence presented by Reliant presents prima facie evidence sufficient to establish personal jurisdiction. The existence of minimum contacts is evident from the fact that Enron Canada derives a significant amount of its revenue from conducting business in or through Houston, Texas, Enron Canada's core business functions such as cash management and power trading are handled by a corporation based in Texas, and its filings with the Secretary of State lists Texas addresses for its officers. All of these factors demonstrate that the Court's exercise of personal jurisdiction over Enron Canada would not offend traditional notions of fair play and substantial justice.

## III. Bankruptcy Stay.

▮ The bankruptcy stay outlined in 11 U.S.C. § 362(a) extends automatic protection to "debtors" filing for bankruptcy. The purpose of the stay is to protect creditors from unequal treatment and provide debtors with a "breathing spell." *See In re Pointer*, 952 F.2d 82, 86 (5th Cir.1992) ("One of the principal purposes behind the automatic stay is to protect creditors from unequal treatment."); *In re Cajun Electric Power Cooperative, Inc.*, 185 F.3d 446, 459 (5th Cir.1999) (citing *In re Commonwealth Oil Ref. Co.*, 805 F.2d 1175, 1182 (5th Cir.1986)) (Recognizing that the automatic stay is designed to give debtors a breathing spell from collectors).

▮ In general, protection offered by the automatic stay extends only to debtors, not to non-debtor third parties such as insurers, co-defendants, or guarantors. *See A.H. Robins Co., Inc. v. Piccinin*, 788 F.2d 994, 999 (4th Cir.1986); *McCartney v. Integra National Bank North*, 106 F.3d 506, 509 (3d Cir.1997); *Carway v. Progressive County Mutual Insurance Co.*, 183

B.R. 769, 774 (S.D.Tex.1995). For example, a law suit against two parties, one of whom files for bankruptcy protection, is stayed against the bankrupt party, but may proceed against the co-defendant.

However, an exception arises where the action against the third party is, in effect, an attempt to circumvent the protection of the stay. In *A.H. Robins Co., Inc.*, the owner of the patent in the Dalkon shield filed for bankruptcy amid a growing deluge of tort actions. 788 F.2d 994. Robins's filing for bankruptcy stayed all actions against it, but many tort plaintiffs severed their action against Robins and continued to assert causes of action against several co-defendants. In response, Robins filed an adversary proceeding against a group of tort plaintiffs, seeking, in part, to extend the protection of the automatic stay and enjoin the suits. Despite the fact that the co-defendants were non-debtors, the district court granted the injunction. On appeal, the Fourth Circuit upheld the ruling, reasoning that despite the exclusive nature of the stay, under "unusual circumstances" the stay may be extended to a non-bankrupt entity. *Id.* at 999. The court defined an "unusual situation" as where "there is such identity between the debtor and the third-party defendant that the debtor may be said to be the real party defendant and that a judgment against the third-party defendant will in effect be a judgment or finding against the debtor." *Id.*

Similarly, in *In re North Star Contracting Corp.*, a former employee and minority owner of a Chapter 11 debtor filed suit against the debtor's president alleging misrepresentations concerning the health of the company. 125 B.R. 368 (S.D.N.Y. 1991). However, the court stayed the employee's suit against the non-bankrupt president reasoning that the stay would hinder the reorganization efforts of the company, adversely effect the bankruptcy estate, and was an attempt to circumvent the automatic stay. The defendant president was the driving force behind the reorganization efforts. Therefore, any suit against him would detract from his ability to successfully reorganize the debtor. Also, because the president was entitled to indemnification from the debtor, the president's loss would have an adverse effect on the bankruptcy estate. Finally, the court concluded that the employee's claim against the president was merely an effort to circumvent the automatic stay and recover against the company.

In the present case, the Court concludes that Reliant's efforts to collect the $78,468,996.60 from Enron Canada are merely an effort to circumvent the automatic stay and recover a debt owed by bankrupt Enron entities. Reliant's initial attempt to collect the $78,468,996.60 was not limited to Enron Canada. In a letter dated February 19, 2002, over a month after four of the five Enron parties filed for bankruptcy protection, Reliant stated that "the Enron Parties are obligated to pay the entire Final Settlement Amount to the Reliant Parties no later than three Business Days after the date of this Notice of Final Settlement Amount." (Pl.'s Br. in Support of Application for Inj., Ex. 1C). Reliant's global demand for payment from the Enron parties constituted a clear violation of the automatic stay which went into effect on December 2, 2001. Having realized its mistake, Reliant sent a letter the following day asserting that "nothing contained in the Notice was intended to be, nor should it be construed to have been, a violation of 11 U.S.C. § 363(a)." (*Id.* at Ex. 1D).

In its present action Reliant seeks to avoid the automatic stay by limiting its collection efforts to Enron Canada. However, the Netting Agreement strictly limits the forms of recovery to which Reliant is entitled. The agreement states that "[Re-

liant] desires now to provide in this Agreement for its right to terminate, liquidate, net, setoff, and apply Collateral upon a Default by ... any Enron Party under any one or more of the Underlying Master Agreements..." (Netting Agreement, p. 2). The limited rights to terminate, liquidate, net, setoff, and apply Collateral do not include the right to do what Reliant now demands, recover the $78,468,996.60 owed by the other, now bankrupt, Enron parties. For example, one of the underlying master agreements was the Master Power Marketing Agreement between Enron Power Marketing ("EPM") and Reliant. Under the Netting Agreement, Reliant may declare all the Enron Parties in default if EPM defaults on the Master Power Agreement. Upon default, Reliant then may exercise any and all of the rights specified in the Netting Agreement. If EPM owed $1,000,000 to Reliant under the master agreement, Reliant could "set off" that amount by any amount Reliant owes EPM. Furthermore, Reliant could also setoff an amount it owes to another Enron entity by what EPM owes Reliant. If Reliant owes $1,000,000 to Enron North America, it could setoff that debt against the debt owed by EPM, cancelling out the two debts. The netting right is exercised the same way. Recoupment allows Reliant to reduce the amount it owes the Enron entities by, for example, the amount in damages Reliant suffered from the default. Under the Netting agreement Reliant also has the authority to keep collateral given by any of the Enron entities and apply it against the amount owed by the others.

However, the rights in the Netting Agreement limit Reliant's ability to recover from any one Enron party to the amount it owes that party or the collateral the party posted. The Netting Agreement does not impose an affirmative obligation on one party to cover all the debts of another. The $78,468,996.60 sought by Reliant, however, seeks to impose such an affirmative duty. In arriving at the "settlement amount" of $78,468,996.60, Reliant has already exercised its right to setoff, net, recoup, and retain collateral. The $78,468,996.60 is the remaining balance. Of this remaining balance, however, nothing is attributable to the underlying master agreement between Enron Canada and Reliant. Rather, Reliant owed money to Enron Canada which was, properly, setoff against the above amount. The remaining balance only includes debts owed to Reliant by the now bankrupt Enron parties.

Reliant's initial attempt to collect the remaining balance was thwarted by the bankruptcy stay. Undeterred, Reliant now seeks to recover the balance from the only non-bankrupt Enron party. However, Reliant's recovery is not permitted by the clearly drafted Netting Agreement. Moreover, Reliant's persistence appears to be little more than its attempt to circumvent the bankruptcy stay. Consequently, the Court concludes that present action constitutes one of the "unusual circumstances" where the automatic stay extends to a third party. As the court concluded in the *North Star Contracting Corporation* case, a party may not circumvent the bankruptcy stay by characterizing an action against the debtor as being limited to recovery against a third-party.

In reaching this conclusion the Court is not concerned that the extension of the stay in this case will negatively affect Enron Canada's other creditors. Reliant's basis for seeking the injunction in this case was that Enron Canada was in the process of liquidating its assets and winding down its operations. Reliant urged that Enron Canada be stopped before it transferred all its assets to the Enron bankruptcy estate. However, under Canadian law as well as Enron Canada's Shareholder Agreement, Enron Canada must satisfy all creditor claims before passing any money along to its shareholders. The bankrupt

Enron North America is the sole shareholder of Enron Canada. Therefore, before any funds are moved into the bankruptcy estate, Enron Canada is required to satisfy all creditor claims. This, the Court concludes, offers adequate protection to Enron Canada's creditors.

The Court further notes that the same result would likely be reached if, assuming *arguendo,* the bankruptcy stay did not apply. Reliant's suit against Enron Canada seeks a declaratory judgment that Enron Canada is liable for the $78,468,996.60 balance owed under the underlying master agreements with the other Enron parties. However, as the court noted above, the Netting Agreement provides for limited rights, none of which include the right to recover the $78,468,996.60 from Enron Canada.

Accordingly, the Court

**ORDERS** that Defendant Enron Canada's motion to dismiss is **GRANTED.**