**Opinion issued May 9, 2024**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-23-00444-CV

_____

**KINETIC CONTENT, LLC, Appellant**

**V.**

**TRAN DANG, Appellee**

---

**On Appeal from the 11th District Court**
**Harris County, Texas**
**Trial Court Case No. 2022-50674**

---

## MEMORANDUM OPINION

Appellant Kinetic Content, LLC (Kinetic), a foreign limited liability company, takes this interlocutory appeal from the trial court's denial of its special

appearance.[1] *See* TEX. CIV. PRAC. & REM. CODE § 51.014(a)(7) (authorizing interlocutory appeal of order denying special appearance). In six related issues, Kinetic contends that the trial court lacked personal jurisdiction over it and thus erred in denying the special appearance. We affirm in part and reverse in part.

## Background

### A. Kinetic, Delirium, and *Love is Blind*

Kinetic is a limited liability company organized under the laws of Delaware with its principal place of business in Los Angeles, California. Kinetic develops and produces unscripted or reality-based media content for various platforms, including streaming services, cable, and broadcast networks. Netflix ordered a fifth season of *Love is Blind* from Kinetic which, in turn, commissioned Delirium TV, LLC (Delirium) to produce the program. Delirium is one of Kinetic's eighteen affiliated production companies.

Kinetic describes *Love is Blind* as a "social experiment" where singles[2] meet and get to know each other while contained in "pods." In these pods, the singles

---

[1] This is one of three appeals arising from the same underlying lawsuit. The other appeals concern Kinetic's appeal of the trial court's denial of its Texas Citizens Participation Act (TCPA) motion, No. 01-23-00443-CV, and Delirium's appeal from the trial court's denial of its motion to compel arbitration, *Delirium TV, LLC v. Dang*, No. 01-23-00383-CV, 2024 WL 1513878 (Tex. App.—Houston [1st Dist.] Apr. 9, 2024, no pet. h.).

[2] While Dang contends that she was Kinetic's employee, Kinetic characterizes the singles as "participants." We do not need to resolve this question to reach our disposition of this appeal. *See* TEX. R. APP. P. 47.1.

cannot see each other, and they only meet face-to-face if they decide to become engaged. Engaged couples are then taken on an all-expenses-paid, week-long vacation at a luxury resort. After the vacation, the program continues to follow the couples as they return to their homes and jobs. Over the next few weeks, the couples are filmed as they attempt to navigate their relationship beyond the pods and decide whether to marry. If the couple chooses to marry, the wedding planning and ceremony are likewise filmed for the program.

Kinetic employed Johnny Tremmel as a Casting Producer for the fifth season of *Love is Blind*, which was at times referred to by Kinetic with the working title "Houston Singles Project." In January 2022, Tremmel contacted Tran Dang (a Houston resident) via social media to recruit her to participate in the program. Though Dang was "confus[ed] at first" as to what Tremmel wanted, he ultimately informed her that he was casting for a Netflix show and wanted to set up an interview with her, which would be recorded for the show's producers. The interview was conducted remotely while Dang was in Houston, Texas and was sent to producers for evaluation on or about February 1, 2022. Dang also participated in a remote psychiatric interview in March 2022, arranged by producers.

From Houston, Dang continued to discuss her participation in the fifth season of *Love is Blind* with various individuals involved in the show's production throughout March and April 2022. These discussions, which occurred via text

3

message, telephone, and email, concerned things like Dang's travel arrangements, wardrobe, and "wedding wish" information. Dang avers, and Kinetic does not dispute, that all of the individuals selected for her season of *Love is Blind* were from the Houston, Texas area. At least one email Dang received from an individual with a "kineticcontent.com" email address included "Houston Singles Project" in the subject line.

## B.    Dang's Allegations

Dang alleges that she was formally hired by Delirium and Kinetic on April 17, 2022. Kinetic arranged for Dang to travel from Houston to Los Angeles, California the following day. Dang remained in Los Angeles for approximately two weeks during the "pods" portion of the program. Though Dang disputes this, Kinetic contends Dang became engaged to fellow participant Thomas Smith. Dang, Smith, and other participants then traveled to Mexico on May 1, 2022.

In her lawsuit against Smith, Delirium, and Kinetic, filed on August 18, 2022, Dang alleges that Smith sexually assaulted her in Mexico. Dang further contends that Kinetic and Delirium conducted 24-hour surveillance of the participants and thus, "most if not all" of Smith's actions were filmed by the production crew and within their knowledge. Dang further contends that the following day, while still in Mexico, she provided a detailed report of Smith's conduct to Delirium and Kinetic producers and reported that she was uncomfortable being around Smith. Dang claims

4

that despite this, Delirium and Kinetic "made attempts to mask [Dang's] sexual assault"; "questioned whether the problem was really one of communication and swept aside her concerns"; "took no corrective action"; and further, "ratified and condoned the mistreatment for the sake of reality television." Dang alleges that Delirium and Kinetic employed Smith; therefore, "Smith's tortious 'actions taken in the workplace' directly impute liability to [Delirium and Kinetic]."

In addition to the civil assault claims[3] Dang pleaded against all three defendants, Dang asserted claims of false imprisonment and negligence against Delirium and Kinetic. Dang contends that Delirium and Kinetic falsely imprisoned her throughout filming and, while not on set, she remained on-call in her hotel room in isolation. Further, Dang asserts that Delirium and Kinetic "prohibited [her] from leaving her hotel room without express permission," "kept [her] under 24-hour surveillance," and "required [her] to remain in [their] physical custody throughout the filming of the show." Dang's lawsuit also states that producers and their assistants confiscated the participant's cell phones, passports, wallets, and any identification information or other devices used to communicate with others; searched their luggage; and controlled access to food, toiletries, and other

---

[3] Dang's assault claims are twofold: "Assault – Threat of Bodily Injury" and "Assault (Battery) – Bodily Injury and Offensive Contact."

necessities. As it relates to Texas, Dang's suit alleges the following occurred after she returned from Mexico:

> 31. [Dang] returned to Houston on May 7, 2022. During this time, she continued to be on non-discretionary call 24 hours a day while being sequestered in the Royal Sonesta Houston Galleria hotel, which [Dang] refers to as the "prison hotel," due to the production team of Delirium TV and Kinetic Content not allowing her to leave as a condition of her employment.

Concerning her negligence claim, Dang alleges that Delirium and Kinetic owed her numerous duties, including duties to:

- Control the security and safety of the premises used for filming, production, and post-production of *Love is Blind*;

- Not injure Dang in a willful, wanton, or grossly negligent manner, or allow another to do so on their premises;

- Treat Dang in a manner that would not subject her to physical or mental injury;

- Control employees and vice-principals, supervise their activities, and prevent them from causing an unreasonable risk of harm to Dang;

- Take complaints and reports of sexual misconduct seriously and investigate them in an effective manner;

- Ensure that reported sexual misconduct is not allowed to continue; and

- Use ordinary care to provide a reasonably safe workplace.

6

Dang's suit further contends that Delirium, Kinetic, and Smith's tortious conduct was malicious, fraudulent, or grossly negligent and thus seeks exemplary damages.

## C. Special Appearance

In response to Dang's suit, Kinetic filed a special appearance challenging the trial court's jurisdiction over it as a nonresident defendant.[4] *See* TEX. R. CIV. P. 120a ("[A] special appearance may be made by any party . . . for the purpose of objecting to the jurisdiction of the court over the person or property of the defendant on the ground that such party or property is not amenable to process issued by the courts of this State."). In its special appearance, Kinetic disputed that it employed either Dang or Smith and argued that Dang's allegations concerned the actions of Delirium, not Kinetic. According to Kinetic, Dang contracted with Delirium, and only Delirium was responsible for filming. Kinetic also contested that it maintained sufficient contacts with Texas to support either general or specific personal jurisdiction. Kinetic argued that even if Dang could establish jurisdiction, the exercise of personal jurisdiction over it in Texas would not be proper because it would offend traditional notions of fair play and substantial justice.

Kinetic supported its special appearance with the declaration of John L. Roncone III, its Vice President of Business and Legal Affairs. Roncone averred that:

---

4       Delirium did not file a special appearance.

7

- Kinetic was organized as a Limited Liability Company under the laws of Delaware in 2010, its registered agent is in Delaware, and its principal office is in Los Angeles, California;

- Kinetic does not maintain an office or phone number in Texas, does not have a bank account in Texas, does not pay taxes or fees to the State of Texas, and is not registered to do business in Texas;

- Kinetic's website includes links directing users to the "SVP" of Communication and Marketing and the "EVP" of Casting and Reception, who do not reside in Texas;

- "None of [Dang's] allegations directly pertain to Kinetic or Kinetic's activities";

- Dang's allegations relating to food, alcohol, accommodations, scheduling, and supervision during *Love is Blind* "pertain to the filming and shooting," and "[a]ll aspects of the filming and shooting of the (season at issue) [of the] series *Love is Blind* were performed by Delirium TV, LLC, its agents, or employees";

- Kinetic and Delirium are separate entities with separate bank accounts and EIN numbers; and

- Smith is not a vice-principal of Kinetic, and at no time did Kinetic employ either Smith or Dang in any capacity.

Kinetic did not attach any further evidence to its special appearance.

Dang filed a response to the special appearance arguing that the pleading had no basis in law or fact and asking the court to sanction Kinetic. Dang contended that Kinetic failed to negate the jurisdictional facts alleged by Dang in her petition and attached additional evidence to support her position that Kinetic's contacts with her in Texas more than satisfied the requirements of the Texas long-arm statute and due process.

In her response, Dang pointed to the following factual allegations from her petition as supporting jurisdiction over Kinetic in Texas:

- Kinetic "engages in business in this state" and "this is a proceeding that arises out of the business done in this state and to which [Kinetic] is a party";

- "At all relevant and material times to the facts and allegations stated herein, [Delirium and Kinetic] employed [Dang] and [Smith,] both residents of Harris County, Texas, who were recruited while in Harris County";

- Delirium and Kinetic "are the producers for a reality television series entitled '*Love is Blind*,' which was filmed in California, Mexico, and Houston, Texas, with Houston serving as the base location for Season 5. All participants on the show at issue are or were Houston area residents, including [Dang] and Defendant Smith. Additionally, [Delirium] and

[Dang's] Participant Release and Agreement contemplates arbitration in the Houston, Texas office of JAMS";

- "On or about April 17, 2022, [Dang], while residing in Houston, was hired by [Delirium and Kinetic] as a participant in a reality television series entitled '*Love is Blind*'";

- "Season 5 production was based out of Houston, Texas, with all of the Season 5 participants being from the Houston area";

- "Defendant Smith, while residing in Houston, was also hired by [Delirium and Kinetic] as a participant for the same reality television series";

- "*Love is Blind* was filmed in California, Mexico, and Houston, Texas, with Houston serving as the base location";

- Dang traveled to California from her home in Houston on April 18, 2022 "where wranglers (assistants) and producers from [Delirium and Kinetic] confiscated her (and the other participants') cell phones, passports, wallets, and any identification information or devices used to communicate with others";

- "[Dang] stayed in California until May 1, 2022 when [Delirium and Kinetic] flew all of the *Love is Blind* Season 5 Houston participants to Mexico"; and.

- Dang "returned to Houston on May 7, 2022. During this time, she continued to be on non-discretionary call 24 hours a day while being sequestered in the Royal Sonesta Houston Galleria hotel, which [Dang] refers to as the 'prison hotel,' due to the production team of [Delirium and Kinetic] not allowing her to leave as a condition of her employment."

In addition to outlining these facts pleaded in her petition, Dang attached various exhibits to her response to Kinetic's special appearance, including her own declaration, emails she received from various individuals with "kineticcontent.com" email addresses, the "Participant Release and Agreement" she signed,[5] and Kinetic's "Production Employee Handbook" (also signed by Dang).

Dang argued that Kinetic's evidence in support of its special appearance was facially insufficient because it did not negate Dang's allegations concerning Kinetic's recruitment of her in Texas, its status as a producer of the program, or any of her contentions concerning it and Delirium's control over her during production and filming. Dang also pointed to the employee handbook provided by Kinetic that

---

[5] Dang included the email she received with the Participation and Release Agreement, which came from "loveisblindcasting@gmail.com." The signature block included the following under the sender's name: "Casting Manager | Love is Blind | Kinetic Content."

she was required to sign as controverting Roncone's averment that Kinetic never employed her.[6]

Kinetic later filed a supplement to its special appearance to address what it contended were "greatly expanded" factual allegations in Dang's response to the special appearance. Kinetic argued that Dang's pleadings failed to allege that Kinetic committed a tort in Texas. Further, Kinetic refuted Dang's assertions that certain individuals involved in the Houston production were Kinetic's employees by presenting evidence that these individuals were in fact Delirium's employees. Kinetic also argued that Dang's causes of action were not based on Kinetic's forum contacts. Lastly, Kinetic contended that Dang failed to prove that (1) Delirium was Kinetic's agent or "alter ego" such that Delirium's actions could be imputed to Kinetic, or (2) Smith was Kinetic's employee or vice principal.

In support of the supplement, Kinetic attached an updated declaration of Roncone, which was largely identical to his original declaration. Kinetic also included the declaration of Stephanie Cohen Williams, Kinetic's "Executive Vice President, Production & Operations." Williams's declaration discussed the relationship between Kinetic and Delirium, stating that Delirium is one of eighteen LLCs affiliated with Kinetic and is member-managed by Kinetic, although it

---

[6]     Dang signed the handbook on the line labeled "Employee's Signature" and the bottom of the signature page reads: "[TO BE PLACED IN EMPLOYEE'S PERSONNEL FILE]."

"maintains separate bank accounts and EIN numbers." Each of the affiliated entities uses the Kinetic email domain extension. She further averred that Delirium "is a production company which is responsible for the filming and production of specific unscripted reality productions and related content." After Netflix ordered season five of *Love is Blind* from Kinetic, "Kinetic commissioned Delirium to produce [it]." Williams explained the concept of *Love is Blind* and how the prospective participant's application materials are processed. She further addressed the duties of each individual identified by Dang and identified the employer of each of these individuals. She supported these statements with documents confirming each individual's employer. According to Williams, each person identified by Dang as being involved during filming and production was an employee of Delirium, not Kinetic. She stated that the Participation Agreement Dang signed with Delirium and the employee handbook are maintained by Kinetic as business records in the regular course of its business.

Dang filed a response to the supplement, contending that the supplement admitted that Delirium was Kinetic's agent with respect to *Love is Blind*, season five. She argued that Kinetic admitted that it "recruited and approved the participants for Season 5 and controlled the very fact that Season 5 was to be the 'Houston [S]ingles [P]roject,' partially shot in Houston and that its subsidiary, Delirium, would do the actual shooting." Dang rejected Kinetic's arguments concerning the "alter ego"

13

theory, contending that she was arguing for a determination that Delirium was Kinetic's agent instead. Dang again noted that season five "focused on ***Houston residents*** and [was] partially shot ***in Houston***" and reasserted her allegations "that a substantial part of her injuries occurred after the sexual assault in Mexico when the cast was brought back to Houston and sequestered in a Houston hotel ("the prison hotel") where she was manipulated and control[led] by Kinetic's agents until she finally quit the production."

After an oral hearing, the trial court signed an order denying Kinetic's special appearance on May 10, 2023 without stating the basis for its denial. This interlocutory appeal followed.

## Personal Jurisdiction

In six related issues, Kinetic argues that the trial court erred in denying its special appearance because: (1) the trial court lacked general jurisdiction over Kinetic, (2) the trial court lacked specific jurisdiction over Kinetic, (3) exercising personal jurisdiction over Kinetic would offend traditional notions of fair play and substantial justice, and (4) Dang failed to establish that either Delirium or Smith were Kinetic's agents. In response, Dang points to the contacts she alleges are sufficient to establish personal jurisdiction over Kinetic in Texas.

## A.  Standard of Review

Whether a trial court has personal jurisdiction over a nonresident defendant is a question of law that we review de novo. *Old Republic Nat'l Title Ins. Co. v. Bell*, 549 S.W.3d 550, 558 (Tex. 2018) (citing *Moncrief Oil Int'l Inc. v. OAO Gazprom*, 414 S.W.3d 142, 150 (Tex. 2013)). When, as here, the trial court did not issue findings of fact or conclusions of law, all relevant facts that are necessary to support its judgment and are supported by the evidence are implied. *Id.* (citing *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002)).

## B.  Applicable Law

Texas courts may exercise personal jurisdiction over a nonresident defendant if: "(1) the Texas long-arm statute authorizes the exercise of jurisdiction, and (2) the exercise of jurisdiction is consistent with federal and state constitutional due-process guarantees." *Old Republic*, 549 S.W.3d at 558 (quoting *Moncrief Oil*, 414 S.W.3d at 149); *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 574 (Tex. 2007). The long-arm statute is satisfied by a defendant doing business in Texas, including by contracting with a Texas resident where either party is to perform the contract in Texas; by committing a tort in Texas; or by recruiting Texas residents directly or through an intermediary located in Texas for employment outside of Texas. TEX. CIV. PRAC. & REM. CODE § 17.042. Because the long-arm statute extends personal jurisdiction "as far as the federal constitutional requirements of due process will

15

allow," the statute is satisfied if the exercise of personal jurisdiction comports with federal due process. *Moki Mac*, 221 S.W.3d at 575 (quoting *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 226 (Tex. 1991)).

Under the Due Process Clause of the United States Constitution's Fourteenth Amendment, jurisdiction is proper if a nonresident defendant has established "minimum contacts" with Texas and maintenance of the suit does not offend "traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (internal quotations omitted). The purpose of the minimum-contacts analysis is to protect the defendant from being haled into court when its relationship with the forum is too attenuated to support jurisdiction. *Schlobohm v. Schapiro*, 784 S.W.2d 355, 357 (Tex. 1990). Accordingly, we focus on the defendant's activities and expectations in deciding whether it is proper to call the defendant before a Texas court. *Id.*

The minimum-contacts analysis requires that a defendant "purposefully avail" itself of the privilege of conducting activities within Texas, thus invoking the benefits and protections of our laws. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985). The defendant's activities, whether they consist of direct acts within Texas or conduct outside Texas, must justify a conclusion that the defendant could reasonably anticipate being called into a Texas court. *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980). It is the quality and nature of the defendant's

contacts, rather than their number, that is important to the minimum contacts analysis. *Guardian Royal*, 815 S.W.2d at 230 n.11. We consider three factors in determining whether a defendant purposefully availed itself of the privilege of conducting activities in Texas:

> First, only the defendant's contacts with the forum are relevant, not the unilateral activity of another party or a third person. Second, the contacts relied upon must be purposeful rather than random, fortuitous, or attenuated. . . . Finally, the defendant must seek some benefit, advantage[,] or profit by availing itself of the jurisdiction.

*Moncrief Oil*, 414 S.W.3d at 151 (quoting *Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 339 (Tex. 2009)).

A defendant's contacts with a forum can give rise to either general or specific jurisdiction. *Id.* at 150. Here, there is no dispute regarding general jurisdiction.[7] Only specific jurisdiction is at issue.

For specific jurisdiction to exist, the plaintiff's claims "'must arise out of or relate to the defendant's contacts' with the forum." *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 352 (2021) (quoting *Bristol-Myers Squibb Co. v. Superior Ct. of Cal., S.F. Cnty.*, 582 U.S. 255, 262 (2017)); *see Old Republic*, 549 S.W.3d at 559 ("[S]pecific jurisdiction exists when the cause of action arises from or is related to a defendant's purposeful activities in the state."); *Moncrief Oil*, 414

---

[7] Dang concedes in her appellate brief that she does not contend that the trial court has general jurisdiction over Kinetic. Therefore, we do not address Kinetic's first issue. TEX. R. APP. P. 47.1.

S.W.3d at 150 (same). Specific jurisdiction does not, however, "always require[e] proof of causation—*i.e.*, proof that the plaintiff's claim came about because of the defendant's in-state conduct," as "some relationships will support jurisdiction without a causal showing." *Ford Motor Co.*, 592 U.S. at 362. Thus, when analyzing specific jurisdiction, we focus on the relationship between the forum, the defendant, and the litigation. *Moncrief Oil*, 414 S.W.3d at 150; *see also Ford Motor Co.*, 141 S. Ct. at 1024 ("[T]he Court has long focused on the nature and extent of 'the defendant's relationship to the forum State.'" (quoting *Bristol-Myers*, 582 U.S. at 262)).

A trial court determines a special appearance by considering the pleadings, any stipulations by and between the parties, affidavits and attachments filed by the parties, and the results of discovery processes, as well as any oral testimony. TEX. R. CIV. P. 120a(3); *see Touradji v. Beach Cap. P'ship, L.P.*, 316 S.W.3d 15, 23 (Tex. App.—Houston [1st Dist.] 2010, no pet.) ("The plaintiff's original pleadings as well as its response to the defendant's special appearance can be considered in determining whether the plaintiff satisfied its burden."). On appeal, the scope of our review of a ruling on a special appearance includes all the evidence in the record. *PetroSaudi Oil Servs. Ltd. v. Hartley*, 617 S.W.3d 116, 132 (Tex. App.—Houston [1st Dist.] 2020, no pet.).

In a personal jurisdiction challenge, the plaintiff and defendant bear shifting burdens of proof. *See Kelly v. Gen. Interior Constr., Inc.*, 301 S.W.3d 653, 658 (Tex. 2010). The plaintiff bears the initial burden to plead sufficient allegations to bring the nonresident defendant within the reach of Texas's long-arm statute. *Id.* Once the plaintiff has done so, the burden shifts to the defendant to negate all bases of personal jurisdiction alleged by the plaintiff. *Id.* One way the defendant can meet this burden to negate jurisdiction is by showing that "even if the plaintiff's alleged facts are true, the evidence is legally insufficient to establish jurisdiction" or that "the defendant's contacts with Texas fall short of purposeful availment." *Id.* at 659.

"[S]pecific jurisdiction requires us to analyze jurisdictional contacts on a claim-by-claim basis." *Moncrief Oil*, 414 S.W.3d at 150 (citing *Kelly*, 301 S.W.3d at 660 (separately analyzing jurisdictional contacts for fraud and trust fund claims to determine specific jurisdiction)). A plaintiff bringing multiple claims that arise out of different forum contacts of the defendant must establish specific jurisdiction for each claim. *Id.* (internal quotations and citation omitted). The reason for this is the distinction between general and specific jurisdiction: "[i]f a defendant does not have enough contacts to justify the exercise of general jurisdiction, the Due Process Clause prohibits the exercise of jurisdiction over any claim that does not arise out of or result from the defendant's forum contacts." *Id.* (internal quotations and citation

omitted). A court, however, "need not assess contacts on a claim-by-claim basis if all claims arise from the same forum contacts." *Id.* at 150–51.

Although we ultimately determine that Kinetic had certain minimum contacts with Texas, because we determine that Dang's assault claim did not arise from or relate to those forum contacts, we analyze each of her claims separately. *See id.* at 151 (analyzing tortious interference claim and trade secrets claim separately because they "arise from separate jurisdictional contacts").

## C.    Assault Claims

On appeal, Kinetic does not challenge the purposeful availment prong of the specific jurisdiction analysis; rather, Kinetic's arguments focus on the relatedness of its contacts to the claims asserted by Dang. *See State v. Volkswagen Aktiengesellschaft*, 669 S.W.3d 399, 412–13 (Tex. 2023) (stating that "[c]ourts can exert specific jurisdiction over a nonresident defendant when (1) the defendant engages in 'some act by which [it] purposefully avails itself of the privilege of conducting activities within the forum [s]tate' and (2) the plaintiff's claims 'arise out of or relate to' those forum contacts") (quoting *Ford Motor Co.*, 592 U.S. at 359)); *see also Moki Mac*, 221 S.W.3d at 579 (stating that in context of specific jurisdiction, "purposeful availment has no jurisdictional relevance unless the defendant's liability arises from or relates to the forum contacts"). While Kinetic does not separately address Dang's assault claims, our personal jurisdiction

20

jurisprudence requires that Dang establish specific jurisdiction for each claim she asserts against Kinetic if they arise out of different jurisdictional facts. *See Moncrief Oil*, 414 S.W.3d at 150. We thus specifically consider whether Dang's assault claims arise from or relate to Kinetic's forum contacts. *See id.*

Dang contends that Kinetic purposefully availed itself of the privilege of conducting activities in Texas in several ways, including the following: (1) recruiting Dang, Smith, and other participants for season five of *Love is Blind* from Houston; (2) focusing season five on Houston and Houston residents; (3) filming for the series in Houston, Texas; and (4) sequestering Dang in a Houston-area hotel and forbidding her from leaving as a condition of her employment. By contrast, Kinetic argues that these alleged contacts are not substantially connected to Dang's claims because other operative facts of Dang's claims occurred outside of Texas, or because Delirium, and not Kinetic, engaged in the activity complained of by Dang. In support of its arguments, Kinetic points to the Texas Supreme Court's decision in *Moki Mac*, 221 S.W.3d 569. This case is particularly instructive as to Dang's assault claims.

In *Moki Mac*, a Texas teenager died on a river-rafting trip in Arizona with Moki Mac Expeditions, a Utah-based river-rafting outfitter. *Id.* at 573. Moki Mac did not directly solicit the teenager for the trip; instead, his family learned about Moki Mac's excursions through another Texas resident, Seals. *Id.* Seals had previously reached out to Moki Mac about a different trip, but that trip was full. *Id.*

Thereafter, Moki Mac placed Seals on a mailing list and later sent her two brochures in Texas regarding upcoming excursions. *Id.* Seals advised Moki Mac of the interest of several other Texans with whom she had shared the information, including the teenager and his family. *Id.* After reviewing the literature and other information on Moki Mac's website and corresponding with representatives from her home in Texas, the teenager's mother decided to send him on the trip. *Id.* His grandmother then sent an application and payment for herself and the teenager. *Id.* Moki Mac then sent a letter confirming payment and other documents it required participants to sign before attending. *Id.* The family signed these forms and returned them to Moki Mac. *Id.*

After the teenager suffered fatal injuries from a fall on the hiking trail, his parents sued Moki Mac in Texas for negligence and intentional and negligent misrepresentation. *Id.* The trial court denied Moki Mac's special appearance, and the court of appeals affirmed on the basis of specific jurisdiction. *Id.* On appeal to the Texas Supreme Court, as it pertained to the relatedness requirement, the parents argued that they were induced to send their son on the trip by Moki Mac's direct solicitation, particularly statements made in the brochures and release sent to them. *Id.* at 585. Some of these statements included assurances such as: "[y]ou don't need 'mountain man' camping skills to participate in one of our trips," and "Moki Mac has taken reasonable steps to provide you with appropriate equipment and/or skilled

22

guides." *Id.* The parents argued that but for these assurances, they would not have sent their son on the trip, and he would not have fallen on the trail. *Id.*

Analyzing "how closely related a cause of action must be to the defendant's forum activities," the Texas Supreme Court ultimately determined that "for a nonresident defendant's forum contacts to support an exercise of specific jurisdiction, there must be a substantial connection between those contacts and the operative facts of the litigation." *Id.* at 579, 585 (citing *Guardian Royal*, 815 S.W.2d at 229–33; *Rush v. Savchuk*, 444 U.S. 320, 326 (1980)). Applying this "substantial connection" test, the court determined that the "operative facts" of the parents' suit primarily concerned the guides' conduct of the hiking trip and whether they exercised reasonable care in supervising the teenager.[8] *Id.* at 585 ("The events on the trail and the guides' supervision of the hike will be the focus of the trial, will consume most if not all of the litigation's attention, and the overwhelming majority of the evidence will be directed to that question."). The court concluded that the alleged misrepresentations were not the subject matter of the case or related to the operative facts of the litigation. *Id.*

---

[8] In *Luciano v. SprayFoamPolymers.com, LLC*, 625 S.W.3d 1 (Tex. 2021), the Texas Supreme Court declined to address whether the "substantial connection" standard still comports with due process following the United States Supreme Court's decision in *Ford Motor Co. Id.* at 16 n.5.

Viewing Dang's assault claims in light of *Moki Mac*, the operative facts of those claims focus on Smith's alleged behavior, the relationship between Smith and Kinetic or Delirium, whether Smith's alleged actions were captured on camera or ratified by the other defendants, and how Kinetic or Delirium responded to Dang's report of the assault. These facts will be the focus of the trial of the assault claims, and the evidence at trial will concern these facts. *See id.* The recruitment of Dang and the other participants in Houston and filming of other portions of the series in Houston (the alleged forum contacts) are not related to the operative facts of the assault claims. *See also Kelly v. Syria Shell Petroleum Dev. B.V.*, 213 F.3d 841, 855 5th Cir. 2000) (holding no specific jurisdiction over Texas wrongful death claims where Texas oil workers who contracted to work for Syrian oil company were killed while working in Syria; even if company had minimum contacts with Texas, claims did not arise from those contacts but from alleged tortious acts committed in Syria); *Cassell v. Loyola Univ.*, 294 F. Supp. 622, 622–23 (E.D. Tenn. 1968) (holding that plaintiff's breach of contract claim did not arise out of business transacted in Tennessee where only connections with forum were that it was student's domicile and where father signed basketball recruitment contract for son to play for New Orleans university, and agents of university communicated there by mail and telephone); *Moki Mac*, 221 S.W.3d at 586–87 & n.6 (discussing *Cassell* and *Kelly* and collecting additional cases).

24

Dang's attempts to distinguish *Moki Mac* are unavailing. She argued to the court below that although the entire expedition at issue in *Moki Mac* took place in Arizona, here, she has alleged "that a substantial part of her injuries occurred after the sexual assault in Mexico when the cast was brought back to Houston and sequestered in a Houston hotel . . . where she was manipulated and control[led] by Kinetic's agents until she finally quit the production." Dang's arguments ignore subsequent Texas Supreme Court precedent requiring us to examine jurisdictional contacts on a claim-by-claim basis. *See Kelly*, 301 S.W.3d at 660; *Moncrief Oil*, 414 S.W.3d at 150–51. When we do so, we conclude that none of Dang's jurisdictional allegations sufficiently relate to her Mexico-based assault claims. We therefore determine that the trial court lacked specific jurisdiction over Dang's assault claims and sustain Kinetic's second and sixth issues as to those claims.[9] We next address Dang's remaining causes of action.

## D.    False Imprisonment Claim

As to her false imprisonment claim and with respect to Texas, Dang alleges that after returning to Houston from Mexico on May 7, 2022, "she continued to be on non-discretionary call 24 hours a day while being sequestered in the Royal

---

[9]    Because we determine that the trial court lacked personal jurisdiction over Dang's assault claims, we do not reach Kinetic's fourth issue concerning whether the evidence was sufficient to support any implied finding that Smith was Kinetic's agent such that Smith's actions can be imputed to Kinetic. TEX. R. APP. P. 47.1.

Sonesta Houston Galleria hotel." In her petition, Dang describes this Houston hotel as the "prison hotel" because "the production team of Delirium TV and Kinetic Content [did] not allow[] her to leave as a condition of her employment." Elsewhere in her petition, Dang contends that her detainment was without her consent and accomplished with violence, threats, intoxicating substances, or other means intended to cause and that did cause her to be unable to exercise her free will. Dang further alleges that this false imprisonment occurred on premises in the exclusive control of Delirium and Kinetic. These are additional allegations concerning events occurring in the forum state.

Kinetic argues that (1) Delirium, not Kinetic, was responsible for the conduct alleged by Dang to constitute false imprisonment; and (2) the remaining jurisdictional allegations are not sufficiently related to Dang's claims and cannot support specific jurisdiction over Kinetic in Texas. Even if we do not impute the conduct of Delirium to Kinetic, we nevertheless conclude that Kinetic's forum contacts establish specific jurisdiction as to the false imprisonment claim.

First, unlike with her assault claim, Dang has alleged that a false imprisonment occurred, at least in part, in the forum state. *See Luciano v. SprayFoamPolymers.com, LLC*, 625 S.W.3d 1, 16 (Tex. 2021) (citing *Ford Motor Co.*, 592 U.S. at 365, and noting that fact that lawsuit arises from injury in forum is "a relevant part of the relatedness prong of the analysis"). Second, regardless of

26

whether Delirium's employees were the "boots on the ground" in Texas during filming and production, Kinetic indisputably targeted Texas as the location for the fifth season of its series, and then commissioned Delirium to carry out filming—in Texas—of that series. Dang has produced emails she received from Kinetic employees, referring and welcoming Dang to the "Houston Singles Project." Further, Williams's declaration states that after Netflix commissioned a fifth season of *Love is Blind* from Kinetic, Kinetic in turn commissioned Delirium to produce Season 5.

As the Texas Supreme Court has explained, although the presence of a parent or subsidiary in a forum state may not be attributed to the other so long as they maintain separate and distinct corporate entities, this "does not mean they can escape jurisdiction by splitting an integrated transaction into little bits." *Cornerstone Healthcare Group Holding, Inc. v. Nautic Mgmt. VI, L.P.*, 493 S.W.3d 65, 73 (Tex. 2016).

The present case is analogous to *Madison Development Group, LLC v. Mattress Firm, Inc.*, 608 S.W.3d 376 (Tex. App.—Houston [1st Dist.] 2020, no pet.), a decision from this court interpreting and applying *Cornerstone*. In that case, Mattress Firm sued multiple defendants concerning an alleged fraudulent scheme between Mattress Firm insiders and real estate developers to charge Mattress Firm artificially inflated rental rates on leases across the country. *Id.* at 382. The appeal

concerned the denial of special appearances filed by various nonresident defendants. *Id.* One of these defendants (Quattro) used a subsidiary to effectuate a lease with Mattress Firm in Lubbock, Texas. *Id.* at 385. Quattro argued that the lease was the subsidiary's contact within the forum and could not be imputed to Quattro, the parent company. *Id.* at 392. Citing *Cornerstone*, this court determined that it was unnecessary to impute the contact to Quattro because the lease was Quattro's own contact with Texas, considering the nature of the transaction. *Id.* at 394. We observed that Quattro, not its subsidiary, "initiated the deal and was heavily involved in bringing the transaction to fruition." *Id.* at 395. Further, "by arguing that the Lubbock lease is a contact of Quattro's, Mattress Firm 'is seeking to trace the purchase of Texas assets to the entit[y] that spearheaded and directed the transaction, and ultimately stood to profit from it.'" *Id.* (quoting *Cornerstone*, 493 S.W.3d at 73).

Similarly here, Dang has presented evidence that (1) Kinetic targeted her in Texas, (2) orchestrated the "Houston Singles Project" by identifying the participants, vetting them, and requiring them to complete various onboarding procedures, and then (3) delegated Delirium to conduct the actual filming and production in Texas (and other locations). Like Mattress Firm, Kinetic "spearheaded and directed the transaction, and ultimately stood to profit from it" by selling the completed series to Netflix. *See id.*

Having determined that the filming and production of *Love is Blind* in Houston, Texas is Kinetic's contact in the forum, we likewise conclude that this contact is sufficiently related to Dang's false imprisonment claim. *See id.* at 396 (addressing relatedness prong of specific jurisdiction analysis and noting that "defendant's purposeful contacts 'must be substantially connected to the operative facts of the litigation or form the basis of the cause of action'" (quoting *Old Republic*, 549 S.W.3d at 559–60)). The conditions during filming and production are the basis for Dang's false imprisonment claim and her allegations that Kinetic and Delirium essentially held her against her will during this time.

We can also expect that a resolution of the false imprisonment claim will involve examining (1) the Participation Agreement, which Kinetic required Dang to execute with Delirium before it ultimately selected her as a participant, and (2) the Kinetic employee handbook, another document Kinetic required Dang to sign during onboarding. *See Moki Mac*, 221 S.W.3d at 585. Both of these documents were sent to Dang in Texas and executed by her in Texas.

In light of the foregoing, we conclude that Dang's false imprisonment claim has a substantial connection to Kinetic's purposeful contacts with Texas, and that the false imprisonment claim arises out of and relates to those contacts. *See id.*; *see also Luciano*, 625 S.W.3d at 15–16 (discussing state of "arise out of or relate to"

29

requirement after *Ford Motor Co.*). We overrule Kinetic's second and sixth issues with respect to the false imprisonment claim.

**E.    Negligence Claim**

For the same reasons, we conclude that the trial court has specific jurisdiction over Dang's claim of negligence. Dang alleges that Kinetic and Delirium acted negligently by breaching various duties owed to Dang, including duties to: (1) control the safety and security of the premises used for filming, production, and post-production of *Love is Blind*; (2) not injure Dang in any willful, wanton, or grossly negligent manner, or allow another to do so on their premises; (3) treat Dang so as not to subject her to physical or mental injury; (4) to control and supervise their employees and vice-principals and to prevent them from causing an unreasonable risk of harm to Dang; (5) take complaints and reports of sexual misconduct seriously and investigate them effectively; (6) ensure that reported sexual misconduct does not continue; and (7) use ordinary care in providing a reasonably safe workplace.

Though some of these allegations allude to events in Mexico (including the alleged sexual assault), the majority concern filming and production generally. Because we have already determined that the filming and production of the fifth season of *Love is Blind* in Texas constitute Kinetic's own contacts with the forum, we likewise conclude that Dang's negligence claim arises from or relates to those contacts. The circumstances of filming and production form the operative facts of

30

the claim and will be the focus of any trial of that claim. Additionally, we foresee both Dang and Kinetic presenting the Participation Agreement or Kinetic employee handbook as evidence at trial, either in support of or to defend against the negligence claim. *See Moki Mac*, 221 S.W.3d at 585. Again, Kinetic sent each of these documents to Dang in Texas and required that she sign them in order to participate in *Love is Blind*.

In determining that Dang's false imprisonment and negligent claims sufficiently relate to Kinetic's forum contacts, we are mindful that a finding of specific jurisdiction does not "always require[e] proof of causation—*i.e.*, proof that the plaintiff's claim came about because of the defendant's in-state conduct" because "some relationships will support jurisdiction without a causal showing." *Ford Motor Co.*, 592 U.S. at 362. However, there must be an "affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that t[ook] place in the forum." *Id.* at 352 (quoting *Bristol-Myers*, 582 U.S. at 256); *see also Carmona v. Leo Ship Mgmt., Inc.*, 924 F.3d 190, 197–98 & n.16 (5th Cir. 2019) (conducting claim-by-claim specific jurisdiction analysis and holding that certain negligence claims resulted from nonresident defendant's conduct in Texas, while another did not). Here, such an affiliation is present with respect to Dang's false imprisonment and negligence claims. Dang alleges that Kinetic recruited her for a

reality television series in Texas and committed various torts against her in Texas as part of the production and filming of that series.

We overrule Kinetic's second and sixth issues with respect to the negligence claim.[10]

## F.    Fair Play and Substantial Justice

Kinetic argues that even if personal jurisdiction exists, any exercise of personal jurisdiction over Kinetic in Texas would be improper because it would offend traditional notions of fair play and substantial justice. *See Int'l Shoe*, 326 U.S. at 316. Specifically, Kinetic points to the pending arbitration in California, arguing that it is unfairly defending the same allegations in both proceedings.

"Only in rare cases . . . will the exercise of jurisdiction not comport with fair play and substantial justice when the nonresident defendant has purposefully established minimum contacts with the forum state." *Spir Star AG v. Kimich*, 310 S.W.3d 868, 878 (Tex. 2010) (quoting *Guardian Royal*, 815 S.W.2d at 231). In reviewing this component, we must consider Kinetic's contacts in light of: (1) the burden on the defendant, (2) the interests of Texas in adjudicating the dispute, (3)

---

[10]    Because we hold that the trial court did not err to the extent that it concluded that Kinetic itself had sufficient purposeful, related contacts with Texas to support jurisdiction for Dang's false imprisonment and negligence claims, we need not address Kinetic's fourth issue—whether the trial court erred by impliedly determining that Delirium was Kinetic's agent, such that Delirium's contacts with Texas can be imputed to Kinetic. *See* TEX. R. APP. P. 47.1; *PetroSaudi Oil Servs. Ltd. v. Hartley*, 617 S.W.3d 116, 142 n.9 (Tex. App.—Houston [1st Dist.] 2020, no pet.).

Dang's interest in obtaining convenient and effective relief, (4) the interstate or international judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the several nations or states in furthering fundamental substantive social policies. *Id.* (citing *Guardian Royal*, 815 S.W.2d at 231). To defeat jurisdiction, Kinetic must present "a compelling case that the presence of some consideration would render jurisdiction unreasonable." *Id.* at 878–79 (quoting *Guardian Royal*, 815 S.W.2d at 231).

Regarding the pending arbitration proceedings in California, we have already explained in a separate opinion that, contrary to Kinetic and Delirium's arguments, the California arbitration proceedings are not identical to the claims in Dang's Texas lawsuit. *See Delirium TV, LLC v. Dang*, No. 01-23-00383-CV, 2024 WL 1513878, at *9 (Tex. App.—Houston [1st Dist.] Apr. 9, 2024, no pet. h.). Rather, the focus of Dang's arbitration demand is Delirium's alleged failure to adequately compensate her for her time spent on-call during the filming and production of *Love is Blind*. *Id.* The arbitration concerns federal wage claims, while the lawsuit alleges Texas state law tort claims. These are not identical. Thus, we reject Kinetic's argument that defending both an arbitration proceeding in California and a lawsuit in Texas state court violates traditional notions of fair play and substantial justice.

We cannot conclude it would be a significant burden for Kinetic to defend a lawsuit here, where at least one agreement (the Participation Agreement)

contemplates dispute resolution through arbitration in either the Los Angeles, California or Houston, Texas offices of JAMS. *See Fish v. Tandy Corp.*, 948 S.W.2d 886, 895–96 (Tex. App.—Fort Worth 1997, writ denied) (determining exercise of personal jurisdiction would not offend traditional notions of fair play and substantial justice where, among other reasons, "at least one agreement at issue in [the] lawsuit compels arbitration in Texas"). Although subjecting Kinetic to suit in Texas imposes some burden on it, distance alone cannot ordinarily defeat jurisdiction. *Spir Star*, 310 S.W.3d at 879 ("Nor is distance alone ordinarily sufficient to defeat jurisdiction: modern transportation and communication have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity." (quoting *Guardian Royal*, 815 S.W.2d at 231) (internal quotations omitted)).

Further, this burden is somewhat mitigated by the fact that Kinetic's employees recruited Dang, a Houston resident, for a Houston-based season of *Love is Blind*, and she alleges a tort occurred (at least in part) in Texas. This implicates a serious state interest in resolving this dispute. *See Moncrief Oil*, 414 S.W.3d at 155. Additionally, litigating the claims against Kinetic, an entity that has minimum contacts with Texas, along with the other named defendants together in Texas promotes judicial economy. *See Cornerstone*, 493 S.W.3d at 74 (considering facts that several other defendants had not challenged jurisdiction and litigating claims against all defendants together promoted judicial economy in determining exercise

34

of personal jurisdiction comported with notions of fair play and substantial justice); *Spir Star*, 310 S.W.3d at 879 ("[B]ecause the claims against [the resident defendant] will be heard in Texas, it would be more efficient to adjudicate the entire case in the same place.").

We conclude that on balance, the burden of Kinetic litigating in a foreign jurisdiction is minimal and outweighed by Texas's interest in resolving the dispute, and we overrule Kinetic's third issue. *See Spir Star*, 310 S.W.3d at 879–80.

## Conclusion

We conclude that the trial court did not err in denying Kinetic's special appearance as to Dang's false imprisonment and negligence claims. However, we conclude that the trial court erred in denying Kinetic's special appearance as to Dang's two assault claims. We therefore (1) affirm that part of the trial court's order denying Kinetic's special appearance as to Dang's false imprisonment and negligence claims, (2) reverse that part of the trial court's order denying Kinetic's special appearance as to the two assault claims and render judgment granting the special appearance as to those claims, and (3) remand to the trial court for further proceedings consistent with this opinion.

Amparo Monique Guerra
Justice

Panel consists of Justices Kelly, Hightower, and Guerra.

35